Virgil JONES, Plaintiff-Appellant,

v.

Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Defendant-Appellee.

No. 15122.

United States Court of Appeals Sixth Circuit.

Aug. 1, 1963.

W. L. Steele, Ashland, Ky., for appellant.

Moss Noble, Asst. U. S. Atty., Lexington, Ky. (Bernard T. Moynahan, Jr., U. S. Atty., Lexington, Ky., on the brief), for appellee.

Before CECIL, Chief Judge, WEICK, Circuit Judge, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

Appellant seeks review of the order of the District Court sustaining the final decision of the Secretary of Health, Education and Welfare holding that he was not entitled to disability benefits under the Social Security Act, Title 42 U.S.C.A. § 401 et seq.

Appellant first made application to establish a period of disability on February 10, 1955. His application was denied by Referee Edward Moeller on July 31, 1957; and his request for review was denied by the Appeals Council September 18, 1957.

Appellant filed the present application to establish a period of disability and for disability insurance benefits on July 27, 1960. This application was denied on May 26, 1961, by Hearing Examiner Peter J. Hoegen; and his request for review was denied by the Appeals Council on January 28, 1961, thus making the Hearing Examiner's decision, the final decision of the Secretary of Health, Education and Welfare.

Appellant then filed his complaint in the United States District Court which held that appellant had not proved disability and that the decision of the Secretary that he was not disabled was supported by substantial evidence. Accordingly, the Court granted the Secretary's motion for a summary judgment dismissing the complaint.

At the time of the hearing in the District Court, appellant was fifty-seven years old; he had a seventh grade education; and his work experience consisted of labor as a shipfitter in the shipyards during World War II, and driving taxicabs thereafter.

Appellant's medical history is important. He first became disabled in October, 1947, and was admitted to the Veterans Hospital at Huntington, West Virginia, on April 5, 1947. At that time Dr. N. C. Robertson observed that, on

admission, appellant was cyanotic and in heart failure. Diagnosis of his condition was heart disease, which was caused by rheumatic fever when he was twenty-one years old. Dr. Robertson stated that, at that time, appellant was extremely ill, had a marked, generalized cardiac enlargement, with congestive failure. He reported: "For about 3 weeks, the patient's life hung in the balance. He was dyspneic, out of oxygen, * * * and entered a long period of weakness with recurrent joint pains and anemia." Appellant remained in the hospital six months, until October 1, 1947, when he was discharged and advised by Dr. Robertson to restrict his activities in order to "keep within the balance of his cardiac reserve" and to continue digitalis treatment at home. Dr. Robertson noted that the patient's history showed he was having mild heart failure while in the service, although he had not been, at that time, hospitalized for this illness.[1]

On March 28, 1950, appellant again was examined by Dr. Don V. Hatton for the Veterans Administration, who reported that he then had subjective symptoms of cardiac insufficiency; that the objective evidence was minimal; and that he should be hospitalized to determine the extent of his illness.

He was hospitalized at the Veterans Administration Hospital in Louisville from April 27 to May 12, 1950, for examination and observation. In November, 1952, he was again examined by Dr. I. W. Gittleman, an internist, and Dr. E. R. Skoluda, an orthopedic examiner, for the Veterans Administration. For some inexplicable reason, the typewritten report shows an inconsistency in first stating: "Examination today also reveals no evidence of heart disease and I would severely question whether there has been any residual heart disease since the attack many years ago in Huntington, VAH." However, after the above statement, there appear reports of some laboratory tests and reports, and then the following final diagnosis:

"DIAGNOSIS 1. Arteriosclerotic heart disease. 2. Coronary arteriosclerosis. 3. Old myocardial infarct. 4. Myocardial insufficiency. CLASS: III 5. Arthritis degenerative, dorsal and lumbar spine, cause undetermined, osteo-arthritis. 6. Hallus valgus, right, symptomatic. 7. Arthritis, peripheral joints, due to rheumatic fever."

The Veterans Administration at Louisville, Kentucky, on February 16, 1955, apparently paid no attention to that part of the foregoing report in which someone inserted the remark that he would severely question whether there has been any residual heart disease since the attack many years ago in Huntington Veterans Administration Hospital, since, on February 16, 1955, it sent on to the Department of Health, Education and Welfare the following letter:

"Mr. Virgil Jones has requested that a report of his medical history be made available to you.

"This veteran was examined on November 18, 1952.

"X-ray: Right shoulder: No bone or joint disease demonstrated. Right knee: Calcification in superior patellar insertion. Knee is otherwise normal. Lungs and heart: Generalized cardiac enlargement.

---

1. The Veterans Administration Hospital report of 1947 was not received by appellant's counsel until after the hearing before Hearing Examiner Hoegen, which was held on May 10, 1961. However, in his brief in the District Court, counsel for appellant asked the Court to include this report as a part of the proceedings, since it "has been referred to throughout the history of this case," and because appellant felt that such report should be included to show the complete history of his case. The report was actually referred to in other medical reports before the Examiner. No objection to its inclusion was filed by appellee, and it comes up to us on appeal as part of the record of the case. It is also referred to in the opening paragraph of appellant's brief, and no exception was taken to such reference in appellee's reply brief. The inclusion of the report, in any event, is not prejudicial to the rights of appellee Secretary.

Cardiac-thoracic ratio approximately 16.5: :32.5. Some posterior displacement of the esophagus by an enlarged left auricle. Moderate sized hypertrophic spurs of mid-dorsal vertebrae, with calcium bridging anteriorly. Lungs normal. Lumbar spine: Small hypertrophic spurs of lumbar vertebrae. No other abnormality in lumbar spine. Electrocardiogram: Old posterior myocardial infarct; left heart strain.

"Diagnoses: Arteriosclerotic heart disease. Coronary arteriosclerosis. Old myocardial infarct. Myocardial insufficiency. Class III. Arthritis degenerative, dorsal and lumbar spine, cause undetermined, osteoarthritis. Hallus valgus, right, symptomatic. Arthritis, peripheral joints, due to rheumatic fever."

On December 16, 1955, appellant was again examined by Dr. D. H. Neustadt, for the Veterans Administration. Dr. Neustadt's report was: "1. Obesity. 2. Rheumatoid arthritis not found. 3. Arteriosclerotic heart disease; coronary sclerosis with myocardial fibrosis, left; ventricular hypertrophy, (excessive development) Class 2."

On April 17, 1959, an "Abbreviated Clinical Record," signed by Dr. W. H. Dearing, set forth that appellant had been on maintenance digitalis since 1947; continued to have shortness of breath on exertion, and for the prior two or three months "had pain in the right lower quadrant of the abdomen, which seems to run around from the back and associated with some dyspnea at times." Dr. Dearing also reported that appellant had arteriosclerotic heart disease, compensated, and arthritis of lumbar spine.

On July 6, 1960, Dr. Jamie P. Scott of Ashland, Kentucky, examined appellant and found that he had "some dyspnea on breathing, marked stiffness and soreness about the shoulders and back and neck muscles on movement with rather marked limitation of motion of the shoulders and spine, kyphosis of the dorsal spine"; that his heart was enlarged to the left; that there was a systolic murmur present in the aortic area; that the X-rays showed a heart silhouette enlargement of the left ventricle, cardio-thoracic ratio 17–31, marked spiking of both dorsal and lumbar vertebrae. Dr. Scott's diagnosis and conclusions therefrom are:

"1. Generalized arteriosclerosis as evidenced by the marked stria of the fundus arteries and the moderate hypertension (the blood pressure reading would be much higher were it not for the aortic valve lesion).

"2. Rheumatoid arthritis by the marked spiking of the dorsal and lumbar vertebrae. The soreness and limitation of motion of the large and small joints.

"3. Aortic valvular heart disease.

"Impression:

"From the above findings I am sure this man is physically unable to enjoy any gainful employment and is totally permanently disabled."

On May 8, 1961, Dr. S. Gray Hunter, having examined appellant in 1949, 1957, 1958 and 1960, submitted the following report:

"It is my opinion that an evaluation of this patient's condition, based on my examinations in 1949, 1957, 1958, and 1960 reveals that this patient has been suffering from a cardiac condition, arthritis and hypertension since 1949 and has been disabled to such an extent from these disabilities so as to prevent him from engaging in any substantial gainful employment and is therefore totally disabled."

On the hearing of appellant's first application on July 25, 1957, appellant testified that he had previously driven a Yellow Cab until sometime in 1952, but that the owner of the cab company had told him he wasn't able to work, and had informed the Veterans Administration to that effect. Appellant further testified that if he had to change a tire, he had to go to bed afterwards, because his heart pained him, and he had pain

all over; that he couldn't stoop over or get up without pain. He also stated that he "put out a garden. My nieces and nephews helped me, and after the beans got ready to pick, my sister picked them and canned them for me—canned part of them for me. I gave her part of them." He further testified that he lived in a little two-room house, that he built with the money he got "cabbing," on a piece of land 120 x 150 feet in size, which included the garden.

In the decision on his first application, Referee Moeller stated that appellant "was unable to continue his work as a cab driver because the employer wanted him to work six or more days a week, whereas he felt .he was only capable of working three. He cultivates a small garden and states that his sister picked beans after they were ripe and canned them." There is no evidence in the record to sustain the Referee's statement in his decision that appellant felt he could work three days a week as a cab driver; and there was no evidence that he cultivated a small garden. While appellant requested review of this decision by the Referee, the Appeals Council denied such request. Appellant did not file action in the District Court as a result of the denial of his request for review; but the record does not show that any notice was ever given to appellant of the Appeals Council's denial of review of the order of July 1957. In his decision on appellant's second application, Hearing Examiner Hoegen stated that, regardless of the first decision, he considered the evidence before Examiner Moeller, as well as the evidence introduced at the second hearing, "because this case arises on a request for disability insurance benefits, and not as the earlier case did, on an application to establish a period of disability."

On the second hearing, which is the subject of this review, Referee Hoegen considered all the evidence adduced at the first hearing, and incorporated in his decision the medical evidence which had been relied upon by Hearing Examiner Moeller on the first hearing.

Appellant, on the second hearing, testified that he suffered continually from shortness of breath and pain; that he had pain continually around his heart, spine, and a "severe pain in my right side." He denied that he ever stated in a prior hearing that he had been able to cultivate a small garden. With regard to the garden, he testified that he had a sister that lived near him and that she had children. He stated: "Sometimes I would hire the garden put out and they would help. I wasn't able to pick up a mess of beans. I wasn't able to stoop over." In answer to the question of his counsel, he testified:

"Q. You have never, as I understand your statement cultivated a garden yourself.

"A. No sir."

Appellant testified that he was drawing a pension from the Veterans Administration because of 100% disability for heart and kidney ailments and rheumatic fever. He further testified that before he became disabled he had worked as a shipfitter's helper. He described the work as follows: "You take a rule and you mark and then you had a burner to burn it. We fitted stairways and set ladders. My job was putting the ladders in the tanks." The Hearing Examiner then conducted an examination, himself, as follows:

"Q. But suppose they started rebuilding ships. Is there anything about your physical condition which would prevent you from again doing that type of ship fitting?

"A. Yes, there is. I can't climb.

"Q. As I say, doesn't some of that work not require climbing? Aren't there men who do that work that don't climb?

"A. Not in my job.

"Q. I'm not talking about your job. I'm talking about jobs on ships, building ships.

"A. I suppose there is some of it done on the ground. You start part of it and set it up.

"Q. Some of it is actually done on the flat, on the level?

"A. Yes, some of it is.

"Q. It just is that you didn't happen to have that kind of a job.

"A. I was in what they called the ladder gang. We set ladders."

The Hearing Examiner continued:

"Q. There was another question where there might be some misunderstanding about what you testified to at the other hearing, and let me read to you part of this and you tell me if it is an accurate account of what went on there. * * * Question: 'And do you have a garden?' Answer: 'Yes.' Question: 'How much ground do you have?' Answer: 'Well, 120 by 150 feet. I put out a garden. My nieces and nephews helped me and, after the beans got ready to pick, my sister picked them and canned them for me—canned part of them for me. I gave her part of them.' Do you remember that part?

"A. I remember that but that's not the quotations I said. I said I wasn't able to pick a mess of beans and sometimes I hired the ground planted. As I stated a while ago, they planted it and take care of it.

"Q. I read this because this is a report certified to by the Referee and the Reporter as having been the questions and answers about those matters that I just pointed out.

"A. That's right. I've got the ground there but I've never been able to tend no garden.

"Q. But when you say, 'I put out a garden,' what does that suggest to you?

"A. I don't think I quoted it that way because I told them I bought the seed and the children planted it and the sister kept it for me and sometimes I would get part of the beans that way but, as for working in it, I couldn't do it."

All of the medical evidence shows that, commencing in October 1947, when appellant was admitted to the Veterans Administration Hospital, and when his life, as Dr. Robertson said, hung in the balance for three weeks because of heart disease, he has been an ill man. To recapitulate, three years later, in 1950, the attending physicians found him suffering from arteriosclerotic heart disease, coronary arteriosclerosis, myocardial insufficiency, degenerative arthritis of the dorsal and lumbar spine, and arthritis in the peripheral joints, due to rheumatic fever. In December 1955, the examining physician found him suffering from arteriosclerotic heart disease, coronary sclerosis with myocardial fibrosis, and ventricular hypertrophy. In May 1961, Dr. Hunter, who had examined appellant in 1949, 1957, 1958 and 1960, stated that he had been suffering from a cardiac condition, arthritis and hypertension since 1949 and was disabled to such an extent from these disabilities so as to prevent him from engaging in any substantial gainful employment and that he was totally disabled. In July 1960, Dr. Scott found that appellant had dyspnea, marked stiffness and soreness about the shoulders and back and neck muscles, with marked limitation of motion of the shoulders and spine; kyphosis of the dorsal spine; that his heart was enlarged to the left, that there was a systolic murmur in the aortic area, enlargement of the left ventricle of the heart, marked spiking of both dorsal and lumbar vertebrae, that he had generalized arteriosclerosis, rheumatoid arthritis, aortic valvular heart disease, and that because of these conditions, Dr. Scott stated from the findings he made that he was sure appellant was physically unable to enjoy any gainful employment and was totally permanently disabled.

The medical evidence clearly shows a relation between appellant's physical impairments and his inability to engage in substantial gainful employment.

Since 1952, appellant testified, he was unable to continue driving a cab. In the

record there is the evidence of the president of the Yellow Cab Company, for whom appellant worked, who stated that appellant had worked for the company prior to and during 1952, and that he was a good employee until he was forced to resign because of illness. The evidence continued: "I knew that Mr. Jones was ill and unable to work although I wished he could have continued to work for me. He informed me that he had to resign because he was unable to work and that he had arthritis in his back and also had a heart condition. I do remember that I tried to make things easier for him while he did work for me but in my opinion, he was unable to stand the strain and therefore could hardly do anything. I knew that it would simply be a matter of time until I would have to let Mr. Jones go because as soon as my insurance company found out about his condition, he would have to quit or my insurance would be cancelled." No attack is made upon the evidence of the president of the Yellow Cab Company on the ground of interest, veracity, or on any other basis. With regard to the foregoing, the Hearing Examiner found that the medical evidence would not preclude a finding that the claimant could do the work of a cab driver. There is no evidence to support this conclusion. At the time the Hearing Examiner made the foregoing decision, appellant was drawing a pension from the Veterans Administration for total disability because of his heart and kidney ailments and rheumatic fever. Six months before the Hearing Examiner's decision, the Chief of the Claims Authorization Section of the Department of Health, Education and Welfare wrote appellant saying that recent medical evidence indicated a strong possibility that appellant was disabled at that time.

The Hearing Examiner further stated that the medical evidence would not preclude a finding that appellant could also do the work of a shipfitter if he were not required to climb ladders while at work, and that the appellant had indicated that there were such jobs in the shipbuilding industry, but that the particular job that he had would require the climbing of ladders and working in high places. There is no evidence in the case that there was a job as shipfitter that would not require such a worker to climb ladders. The only evidence on this point is that some of a shipfitter's work is done on the ground. The Hearing Examiner further found that the evidence would seem to indicate that even if the claimant could not work full time as a cab driver, the evidence showed that "he is physically able, *even at present,* to work on a part-time basis." (Emphasis supplied.) There is no evidence to sustain such a conclusion. In his decision, the Hearing Examiner stated: "The claimant denied that at the prior hearing he declared that he cultivated a garden, but the Examiner finds from the transcript of testimony that the claimant did indeed declare at the first hearing that 'I put out a garden.'" Apparently, in spite of the repeated explanations of appellant that he did not cultivate the garden and did not work in it, the Examiner concludes that he did cultivate a garden, and did work in it, from the statement that he made at the first hearing that he "put out a garden." This statement of appellant is certainly consistent with his devoting a piece of his land to garden purposes, and having his nieces and nephews do the planting. In any event, the light work of assisting in planting his own bean patch, would be no indication that appellant could engage in substantial gainful employment; and that is the controlling point here.

In addition to appellant's medical evidence, his own testimony and the other evidence on his behalf was entitled to fair consideration; it was in support of the medical evidence. He had no way to establish his case if his credible medical evidence was disregarded. While the Secretary may have expertise in respect of some matters, we do not believe he supplants the medical expert. Hall v. Celebrezze, 314 F.2d 686, 690 (C.A. 6).

In the foregoing case, Judge Weick, speaking for this Court, said:

"In our opinion, it was competent for medical experts to testify as to the nature and extent of Hall's ailments, whether temporary or permanent, their treatment and prognosis. They could testify as to what effect these ailments had on his health and his ability to perform manual labor including the degree of his disability.

"Wigmore states:

"'Opinions as to physical disability to pursue an occupation, under the Federal statutes for War-veterans and under accident insurance policies, here involve the additional risk of being an improper opinion as to the legal effect of the statutory or contractual phrase. But since those phrases are also common in general popular usage, the Opinion rule ought not to stand in the way of opinions offered by persons having the requisite knowledge of the party's physical condition.' Wigmore on Evidence, 3rd ed. § 1975, p. 120.

"In Tackett v. Eastern Coal Corp., 295 Ky. 422, 174 S.W.2d 707 the court said:

"'The percentage of disability cannot be fixed with mathematical accuracy, but opinions of medical experts based on examinations made by them are competent.'

"In United States v. Calvey, 110 F.2d 327 (C.A. 3) a physician was permitted to testify that the patient was disabled 'from doing any kind of work.' In United States v. Cannon, 116 F.2d 567 (C.A. 1), it was held proper for a doctor to testify that disability was total and permanent. See also: Rowe v. Gatke Corp., 126 F.2d 61 (C.A. 7); Corrigan v. United States, 82 F.2d 106 (C.A. 9).

"It was not necessary that Hall be bedridden or wholly helpless in order to establish his claim for benefits. Berry v. United States, 312 U.S. 450, 455, 61 S.Ct. 637, 85 L.Ed. 945; Cf. Everhart v. State Life Ins. Co., 154 F.2d 347 (C.A. 6); Mutual Life Ins. Co. v. Bryant, 296 Ky. 815, 177 S.W.2d 588, 153 A.L.R. 422 and Gibbons v. Metropolitan Life Ins. Co., 135 Ohio St. 481, 21 N.E.2d 588.

"In our opinion, on the basis of the uncontradicted evidence, Hall is entitled to disability benefits under the Act."

In Ellerman v. Flemming, D.C., 188 F.Supp. 521, 527, the Court said:

"Under the Social Security Act, unlike some other statutes, it is not the burden of the claimant to introduce evidence which negatives every imaginable job open to men with his impairment, and of his age, experience and education. It is quite enough if he offers evidence of what he has done, of his inability to do that kind of work any longer, and, of his lack of particular experience for any other type of job. *If there are other kinds of work which are available and for which the claimant is suited, it is the defendant's burden to adduce some evidence from which a finding can be made that he can do some type work; actually, not apparently * * *. Here, the Referee has made no such finding, whatsoever, based on evidence.*" (Emphasis supplied.)

In Butler v. Flemming, 288 F.2d 591, 595 (C.A. 5), the Court held:

"[The Claimant] was not required by the use of a catalogue of the nation's industrial occupations to go down the list and verbally negative his capacity for each of them or their availability to him as an actual opportunity for employment."

It was stated by the Court in Randall v. Flemming, D.C., 192 F.Supp. 111, 112, that:

"[The] test of a claimant's disability or inability to engage in any

substantial gainful activity is a subjective one and claimant need not establish complete absence of any opportunity for substantial gainful employment and he need only establish that he has become disabled from employment in any work in which he could profitably seek employment in light of his physical and mental capacities and his education, training and experience and he need not be totally helpless or bedridden."

Because of appellee's failure to carry the burden to show that appellant was able to perform some kind of substantial gainful activity, appellant is entitled to prevail on his proofs that he was totally disabled for any substantial gainful activity. Rice v. Celebrezze, 315 F.2d 7, 17 (C.A. 6). Here no evidence was introduced on behalf of appellee; and, instead of appellee's carrying the burden of proof, the evidence supports appellant's claim.

Appellee Secretary submits that under the statute,[2] appellant would only be eligible for benefits if he had been disabled prior to March 31, 1955. We are of the view that the record shows that the claimed disability existed prior to that date.

The findings in this case were not supported by substantial evidence. On the basis of the uncontradicted evidence, appellant was entitled to disability benefits under the Act.

In accordance with the foregoing, the judgment of the District Court is reversed and the case is remanded to the Secretary of Health, Education and Welfare with directions that appellant be granted a period of disability and disability benefits in accordance with the Social Security Act.

---

2. As stated by counsel for the Secretary: "To be eligible for a period of disability and for disability insurance benefits, a claimant must meet the special 'insured status' requirements contained in section 216(i) (3) and 223(c) (1) (A) of the Act (42 U.S.C.A. 416(i) (3) and 423(c) (1) (A)). This insured status requirement is that the individual must have had a continuous 'disability' for not less than six continuous full calendar months but still continuing indefinitely at the time of the filing of his application, which began at a time when he had twenty quarters of coverage (as defined in section 213 of the Act (42 U.S.C.A. 413)) within the forty-quarter period ending with the first quarter of disability. The plaintiff last met this quarters of coverage requirement on March 31, 1955. Therefore, to be eligible for a period of disability and for monthly insurance benefits, based on his application of July 27, 1960, plaintiff must have been disabled no later than March 31, 1955, and this disability must have continued through the date of his application."