**Loyd A. KING, Plaintiff,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Defendant.**

Civ. A. No. 464.

United States District Court
W. D. Arkansas,
Fayetteville Division.

Nov. 21, 1963.

Charles W. Atkinson, Fayetteville, Ark., for plaintiff.

Charles M. Conway, U. S. Atty., E. A. Riddle, Asst. U. S. Atty., Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

Plaintiff seeks review of a final decision of the defendant Secretary denying disability benefits under the Social Security Act, 42 U.S.C. § 401 et seq. This court has jurisdiction of the action pursuant to Sec. 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Plaintiff first made application for disability benefits August 15, 1957. That application was denied and he did not appeal.

Plaintiff filed the present application for disability benefits and to establish a period of disability on November 22, 1960. This application was disallowed on March 17, 1961; a hearing on his application was held August 24, 1961, by Hearing Examiner Bayard Taylor; the

hearing examiner denied the application December 15, 1961; and his request for review was denied by the Appeals Council on February 21, 1962, thus making the hearing examiner's decision the final decision of the Secretary of Health, Education and Welfare.

This action was filed by the plaintiff on April 18, 1962, and the defendant Secretary filed a motion to remand on June 4, 1962. The plaintiff filed a response resisting the motion to remand on June 13, 1962. However, plaintiff by letter of June 19, 1962, withdrew objection to the motion, and an order was entered with plaintiff's consent on June 19, 1962, remanding the case to the Secretary of Health, Education and Welfare for further administrative action.

An additional hearing was held on March 27, 1963, by Hearing Examiner Gary Karp; the application was again denied on April 3, 1963; the Appeals Council modified and affirmed the hearing examiner's report on May 24, 1963, denying disability benefits. On August 22, 1963, the defendant Secretary filed an answer praying dismissal of the complaint. The case is now before the court on plaintiff's motion for summary judgment.

The pertinent facts of the plaintiff's non-medical history are not in dispute. Plaintiff was born at Braden, Oklahoma, May 27, 1915. He had a tenth-grade education and quit school at age sixteen. He was first employed as a messenger for Western Union for fifteen months. His next employment was in a filling station and garage where he began to learn the automobile mechanics trade. A year later he was employed as a mechanic at the Motor Inn Garage in Fayetteville, Arkansas. His next employment was with Lake's Chevrolet in Springdale, Arkansas. He then went to the West Coast and was employed by Consolidated Aircraft Company as a truck driver and oiler. He was next employed by Washington County, Arkansas. He worked as a mechanic on the county road machinery for about five years, at which time he was drafted into the Army. He entered the Army in 1944 and served two years.

When he was discharged from the Army he returned to his job with the county. He next operated a Cities Service Station and did mechanic work. Six or seven months later he went to work at the local DeSoto and Plymouth Agency and Garage. He was then offered a job with an asphalt mining company in Uvalde, Texas. For the next three years he was employed as a working foreman and mechanic for White's Uvalde Mines at Uvalde, Texas. In April 1956, while working at White's on a catwalk approximately 35 feet above the ground, plaintiff fell and was seriously injured. At the time of his fall he was hospitalized at Memorial Hospital in Uvalde, Texas. He returned to White's after about three months and was employed in light work, checking and issuing oil barrels, but was injured again when his clothes caught fire. After his second injury the mining company would not employ him because of his physical condition, and he then returned to Fayetteville, Arkansas, where he was employed for a short time as a mechanic. He presently lives in Fayetteville, Arkansas, with his wife and daughter and has not been regularly employed since 1956. However, there is no question that the palintiff meets the special earnings requirement. The hearing examiner's report of April 3, 1963, states that the plaintiff met the special earnings requirement on November 22, 1960, or within three months thereafter.

Plaintiff's medical history is the important consideration in this action. When he fell from the catwalk in 1956, he was examined by Dr. Woods R. Howard of Uvalde, Texas. Dr. Howard found multiple musclo-skeletal injuries to the plaintiff, who had entered the hospital in a state of shock. In a letter dated June 26, 1956, to the insurance carrier of plaintiff's employer, Dr. Howard stated that upon his examination of April 1, 1956, he found the following injuries:

"(1) Severe comminuted fracture of the intertrochanteric and subtrochanteries regions of the left femur,

"(2) Comminuted, impacted fracture left os calcis with dislocation of the subastragalar joint,

"(3) Fractures of the pelvis (Rami and body right pubic bone),

"(4) Fractures of the left transverse process 5th lumbar vertebra,

"(5) Complete dislocation and comminuted impacted fractures of the left radial head and coronoid process · ulna and trochlea of the humerus."

Plaintiff was in Dr. Howard's care from April 1956 until July 1, 1956, and was hospitalized April through June 7, 1956. In a letter to the Industrial Accident Board of the State of Texas, dated January 15, 1957, he stated that treatment of plaintiff was as follows:

"Under general (pentothal) anesthesia, the fracture dislocation of the left elbow was reduced and immobilized, the left leg was put in Buck's traction and general measures instituted for treatment of shock. The following day, Dr. John J. Hinchey from San Antonio, Texas (orthopedic surgeon) came to Uvalde, and under spinal anesthesia, reduced and immobilized the fracture dislocation of the left calcaneous and reduced and pinned the left hip and femur. Approximately one week later, he returned and removed the heads of the left ulna and radius under general anesthesia. Mr. King remained in the Memorial Hospital, Uvalde, Texas, until the middle of June when he was permitted to return home for further convalescence where I followed him until July 1, 1956."

Upon his return to Fayetteville, Arkansas, plaintiff was treated several times at the Veterans Hospital. The rating sheets of the VA Hospital found in the transcript at page 490 substantiate the examination and treatment described by Dr. Howard in his January 15, 1957, letter, although the VA denied plaintiff a pension in their letter of December 5, 1957, at page 488 of the transcript.

The VA Hospital treated plaintiff in May and December 1958 for severe pain in the left ankle and leg, but the Board of Appeals of the Veterans Administration, in their report on page 483 of the transcript, denied non-service connected disability pension because he was in their opinion, only 50 percent disabled, and the VA required a 60 percent disability. On July 31, 1961, the plaintiff was awarded a monthly non-service connected disability pension based on his physical impairments.

In February 1961 plaintiff was given an extensive examination by Dr. Coy C. Kaylor. Dr. Kaylor, an eminent orthopedist, in his letter to the Arkansas Rehabilitation Service, dated February 16, 1961, stated:

"*Physical Examination:* Patient is a 46 year old white male who appears to be in good general health. In the examining gown it is noted that there is a long scar over the left upper thigh. There is marked loss of rotation of the left hip joint and extreme tenderness over the left hip area. He is markedly tender over the lumbosacral region and this tenderness extends down and becomes very severe over the coccyx. Motions of the lumbar spine are markedly limited and there is marked muscle spasm of the lumbar spine. There is a very positive Fabre Patrick test on the left. Straight leg raising is considerably limited on the left. However, reflexes are present and equal. There is a moderate amount of atrophy of the entire left lower extremity as compared to the right. There is marked loss of motion of the subastragalar joint of the left ankle but the ankle joint itself has good motion. There is an operative scar, well healed, over the left elbow with some apparent shortening of the radius resulting in some bowing of the middle forearm.

"*X-ray Examination:* X-ray examination was made of the pelvis, left hip and left ankle and foot. There is a well healed fracture, intertro-

chanteric, of the left hip with the lesser trochanter lying free. There is a long Jewett nail plate held by several screws to the shaft of the femur. There is a healed fracture of the pelvis which appears to have involved both the rami of both sides of the pelvis with a considerable deformity of the pelvic ring. There is some tilt of the lumbosacral articulation. X-rays of the left ankle and foot reveal a healed fracture of the os calcis which appears to have entered the joint and there is some narrowing of the joint suggesting traumatic arthritis of the subastragalar joint.

"*Conclusion:* This man sustained multiple and severe injuries to his pelvis, low back, left hip and left foot in 1956. As the result of the injuries the man has marked disability of his low back, left hip and left foot. In my opinion this man is totally and permanently disabled. I know of nothing which would restore him to the point where he could carry on with mechanical type work which he was doing at the time he was injured. He could do only the lightest of work and I doubt if he could stand up under any type of work for longer than about three to four hours at a time. Therefore, in addition to my conclusion that he is permanently and totally disabled, I think it is very unlikely that he could carry on with any type of work for which he has been trained nor could he drive a truck. I understand that he has been a truck driver also in the past. It might be possible that some time in the future that he might be trained for some various sedentary type of occupation."

After the order remanding the case, plaintiff submitted to an examination given by a physician chosen by the defendant, Dr. John M. Hundley. Dr. Hundley stated in his letter of November 20, 1962, that plaintiff was restricted only in excessive arduous activities, but his diagnosis was in substantial agreement with Dr. Kaylor. His conclusion as to the restriction on the plaintiff's activities, however, differs in the degree of disability and effect on plaintiff's ability to stand, bend, lift, stoop or squat.

On November 20, 1962, the plaintiff was examined by Dr. David L. Liberman, a psychiatrist of Little Rock, Arkansas. In a letter to the Social Security Administration on November 29, 1962, Dr. Liberman states that the plaintiff had a mental age of twelve years, and that in his opinion the plaintiff needed psychotherapy. The plaintiff was also examined by Dr. Elizabeth D. Fletcher, a neurologist and psychiatrist of Little Rock, Arkansas. Dr. Fletcher in her letter to the Appeals Council on February 26, 1963, stated that in her opinion the plaintiff did not have any evidence of psychosis or neurosis and there was no pain or discomfort shown.

The plaintiff was given an extensive and thorough examination over a five-day period in March 1963 by Dr. Frank Riggall of Prairie Grove, Arkansas. Dr. Riggall appeared at the hearing on March 27, 1963, and testified on behalf of the plaintiff. Dr. Riggall stated that the plaintiff walked with a limp in his left hip and that plaintiff's left ankle had reduced mobility, both dorsiflexion and plantarflexion, and in abduction and inversion. He found that abduction, adduction, internal rotation, flexion and extension of the left hip joint was limited by approximately one-third of its normal range. The left interior superior iliac spine was between one-half inch and three-quarters inch higher than the right side, and the pelvis and femur are tilted upward in the same amount. Dr. Riggall found that the plaintiff had a pin and a plate in his upper left femur and femoral neck fastened with nine screws. With respect to the condition of the femur, Dr. Riggall made the following statement, beginning at page 206 of the transcript:

"Q. And what is the condition of the head and neck of the femur on the left side?

"A. The neck is shortened, the head is good. The lesser tro-

chanter has been torn off and is lying free in the upper thigh medial to the upper femoral shaft and beneath the femoral neck apparently still attached to the psoas major muscle.

"Q. What is the significance of that, Doctor?

"A. Well the psoas major muscle rotates the lower limb outward and since his rotator, his external rotator, the effect of the psoas is gone. He will have difficulty in rolling his thigh outward. Moreover, when the psoas major goes into action, contraction, by reflex action, I am certain there must be some disturbance as it pulls on the lesser trochantal portion of bone to which it is still attached in a position where it has no business to be.

"Q. Did you notice any other bone fragments in that area which had been broken off or torn loose?

"A. Yes, about an inch and a quarter below the junction of the neck of the left femur with the shaft and just medial to that portion of the shaft there is another flake of extradensity about a quarter to three-eighths of an inch long vertically and perhaps an eighth of an inch horizontally which I take to be a displaced fragment of bone, probably displaced when the lesser trochanter was torn from the femoral shaft in the accident.

"Q. Is it medically feasible or surgically feasible to repair that bone damage where the trochanter is still attached to that bone fragment?

"A. The surgical anatomy, the surgical approach would be extremely difficult from the medial side because of the presence of nerves and arteries and in sixteen years of regular annual attendance at the National-Royal National Orthopedic Hospital in London, I have never seen it done.

"Q. Why isn't it normally done, doctor?

"A. Because of the difficulty of surgical approach.

"Q. Is there any danger to the patient?

"A. Yes, to the nerves and blood vessels. It is on the inside. It is not easy to get at.

"Q. What would be the nature of the danger to the patient? I understand there might be permanent nerve or blood pressure damage, but what would be the effect on the patient?

"A. It depends on the amount of damage. If the femoral nerve or its branches or the sciatic nerve or its branches or the femoral artery or its profunda femorus branch were damaged severe hemorrhage could occur, and if the hemorrhage were— sorry, if the vascular damage were sufficiently severe the limb could be lost, from gangrene.

"Q. And you would experience loss of use of the limb if the nerves were damaged in an operation, would you not?

"A. At least in part."

Severe pelvis damage was found by Dr. Riggall. At page 208 of the transcript he stated:

"Q. Did you observe in any of the bones of the pelvis any damage from the injury?

"A. Yes.

"Q. Can you describe that if possible?

"A. There is a sign of an old fracture through the inferior ramus of the pubic bone. The

entire pelvis left side has been broken and shoved up so that the left side of the pelvis is a half to three-quarters of an inch higher than the right. The left wing of the sacrum was broken and is push up, fixed there in its healed position. The left transverse process of the fifth lumbar vertebrae was also broken off, shoved up and is fixed in this untoward position of a half to three-quarters of an inch higher than its fellow. I would like to add that I cannot be certain that some of the pain in Mr. King's heel is not pressure on the first sacral root traversing the area I have just mentioned, that is the fifth left lumbar transverse process in the left wing of the sacrum. The intermittency of the pain in his heel could well be explained by the settling of the spinal column that takes place in all of us after we are upright a certain time, and the discs being elastic settle down a bit by their superimposed weight.

"Q. Doctor, you have described certain physical evidence of damage in the fifth lumbar region, did you observe any other damage in the lumbar vertebrae in the region of any of them?

"A. Yes, there has been partial crushing of the posterior portion of the lumbar five body and of lumbar one body in its entirety—correction, lumbar five body to lumbar one.

"Q. What examination—excuse me just a moment, I assume, Doctor, that was the extent of your physical and X-ray examination of the area of the femur and the pelvis and the lumbar area?

"A. By no means.

"Q. Will you please proceed.

"A. On physical examination his lower back is flat and stiff. His movements anterior and posterior, laterally and twisting are limited by one-third. X-rays show that the lumbar curve is straightened from its former lordotic position. The left sacral iliac joint, upper half is obliterated. That, of course, took place when the pelvis was fractured and pushed upwards. X-rays confirmed the mass that was felt, over his right ischial tuberosity there is a bony exostosis shown there. There was osteophytosis bilaterally the left being the worst between lumbar three and lumbar four bodies."

In his examination Dr. Riggall also found that the plaintiff's left arm was impaired. The grasp in the plaintiff's left hand was restricted and he could not raise his left arm as high as the right arm. The plaintiff's neurological condition was stated by Dr. Riggall at page 213 of the transcript, as follows:

"A. That neurologically except for very slight involvement of his left vestibular apparatus, cause unknown, possibly accidental, that the central nervous system as such was normal. On examining or rather observing his behaviour, he wept profusely for several minutes by my watch, the first time about six and the second about between seven and eight, when history was being taken and I was questioning him about his pelvic fracture. He wept again on the next day when I was discussing with him his life situation in general, what he did to pass the time, what his status was in the family, economically, husband and father-wise, and economically. During the second attack of weeping he became extremely agi-

tated. In addition, I gathered that there was something that I did not talk to him about.

"Q. Will you give the reporter the scientific name for what impression you got? Where you refer to something.

"A. Felo de se. I gathered he had thought about it to say the least.

"Q. And I believe you told me, he in conversation yesterday, that you intentionally avoided mentioning that to him for fear of making a suggestion.

"A. I have it so written in the record.

"Q. Doctor, what conclusion did you come to as a result of this emotional disturbance which you have described?

"A. He is mentally ill.

"Q. Does that type of mental illness have a name?

"A. Yes.

"Q. What is the name of it?

"A. Depression with agitation."

In response to a question as to the effect of plaintiff's impairments on his ability to engage in gainful activity, Dr. Riggall, at page 218 of the transcript, stated:

"A. Based upon my knowledge of his limited education, his lack of training for a real trade and his age, he is unemployable in anything that he was physically or educationally suited for and because of his mental illness. He is unemployable in any economic circumstance where reliability, responsibility, initiative of any degree would be required.

"Q. Would you say, Doctor, that that condition is a permanent condition?

"A. I would, yes."

Dr. Riggall detected a severe emotional disturbance although he did not recommend that the plaintiff be institutionalized. This same disturbance was also noted in a report on June 7, 1961, by Dr. J. Weatherly of the Veterans Administration. Dr. Weatherly stated that in his opinion the plaintiff would need hospitalization if the symptoms did not subside as there was a condition which he described as neurotic depressive.

In a letter on January 23, 1962, Mr. James E. Gibson, Employment Counselor, Employment Security Division, Arkansas Department of Labor, was of the opinion that the plaintiff could not be employed. At the hearing on March 27, 1963, Mr. Gibson stated that in his opinion, considering the plaintiff's experience, age, physical condition, the plaintiff could not function in any job.

At the request of hearing examiner, Mr. Fred Wiener of Houston, Texas, testified as a vocational guidance expert. Mr. Wiener stated there were several categories listed in the "Dictionary of Occupational Titles" for which the plaintiff might be suited. The expert witness testified that he had no knowledge of the opportunities in the area where the plaintiff resided.

The only issue before the court upon the record is whether there is substantial evidence in the record to support the decision of the defendant Secretary.

The findings of fact made by the hearing examiner are conclusive if supported by substantial evidence, Celebrezze v. Bolas, (8 Cir. 1963) 316 F.2d 498, and a majority of courts also extend the finality of the hearing examiner's findings to inferences and conclusions which he draws from the evidence if there is a substantial basis for the conclusion, Hawkins v. Celebrezze (W.D.Ark.1962), 210 F.Supp. 341; Morris v. Ribicoff (W. D.Ark.1961), 194 F.Supp. 841. Conclusions of law made by the hearing examiner are entitled to great weight, Harmon v. Ribicoff (W.D.Ark.1961), 192 F.Supp. 743. But such conclusions of law are not binding upon the court, Blanscet v. Ribicoff (W.D.Ark.1962), 201 F.Supp. 257.

The applicable statutes and regulations require a medically determinable physical impairment, 42 U.S.C.A. §§ 416(i) (1), 423(c) (2), which can be expected to continue for a long and indefinite period of time, 20 C.F.R., Sec. 404.1502(f), of such extent as to prevent a person from engaging in any substantial gainful activity before disability can be granted.

The plaintiff's extensive history and the nature of his various afflictions, as evidenced by the medical reports therein, amply demonstrate that his impairments are permanent and of indefinite duration. The critical question is whether these various medically determinable impairments are of such magnitude so as to prevent the plaintiff from engaging in any substantial gainful activity.

■ The opinions of the medical experts are certainly not conclusive as to whether the plaintiff can engage in substantial gainful activity, but are at least some evidence of the restriction on plaintiff's activity because of his physical condition. Jones v. Celebrezze (6 Cir. 1963), 321 F.2d 192.

■■ The plaintiff sustains his burden of proof under the Act when he produces evidence that shows his physical disabilities, education, experience and inability to engage in substantial gainful activity in the future, Jones v. Celebrezze, supra, and he certainly does not have to be totally helpless or bedridden to be entitled to disability benefits, Hawkins v. Celebrezze, supra; Park v. Celebrezze (W.D.Ark.1963), 214 F.Supp. 153.

In Ellerman v. Flemming (W.D.Mo. 1960), 188 F.Supp. 521, at page 527, Chief Judge Ridge, while a District Judge, very ably analyzed the plaintiff's burden of proof as follows:

"Under the Social Security Act, unlike some other statutes, it is not the burden of the claimant to introduce evidence which negatives every imaginable job open to men with his impairment, and of his age, experience and education. It is quite enough if he offers evidence of what he has done, of his inability to do that kind of work any longer, and, of his lack of particular experience for any other type of job. If there are other kinds of work which are available and for which the claimant is suited, it is the defendant's burden to adduce some evidence from which a finding can be made that he can do some type of work; actually, not apparently."

The hearing examiner apparently failed to give sufficient consideration to the manner and degree in which the plaintiff's various impairments affect him as an individual in his desire to secure employment which could be characterized as substantial gainful activity. There is no doubt that the plaintiff manifests a sincere desire to secure employment. The letters from the Social Security Administration indicate that he sought their assistance in his search for employment.

The hearing examiner concludes that the plaintiff failed to establish an impairment of such severity as would preclude him from engaging in some type of substantial gainful activity, yet the record affirmatively establishes that the plaintiff is physically and mentally and emotionally incapable of any substantial gainful employment.

■ The plaintiff should not be required to refute speculative possibilities of employment based upon the "Dictionary of Occupational Titles," when he is not physically and mentally capable to engage in any employment, Park v. Celebrezze (W.D.Ark.1963), 214 F.Supp. 153; Jones v. Celebrezze (6 Cir. 1963), 321 F.2d 192.

■ Based upon the complete record before the court, including the nature of the plaintiff's physical and mental impairments, together with his lack of education, age, and experience, the court is convinced that the plaintiff sustained his burden of proving disability and a period of disability as defined in the Act, and that the conclusions of the hearing examiner and the Appeals Council to the contrary were not based upon substantial

**466**

evidence or upon a proper application of the governing law.

Therefore, an order is being entered today in accordance with this opinion, granting the plaintiff's motion for summary judgment, and reversing and remanding the case to the defendant Secretary with directions that the plaintiff be granted a period of disability and disability benefits in accordance with his application.