**Clifton E. STEPHENS**

v.

**John W. GARDNER, Secretary of Health, Education and Welfare.**

**Civ. A. No. 4735.**

United States District Court
E. D. Tennessee, N. D.

July 28, 1966.

Earl Leming, Knoxville, Tenn., for plaintiff.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., G. Wilson Horde, Asst. U. S. Atty., Knoxville, Tenn., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, Chief Judge.

On May 25, 1964, this Court entered an order re-referring this cause to the Hearing Examiner to determine and report to the Court whether, during the period May 31, 1952 to December 31, 1954 there was any work available to the claimant in the community in which he lived, the Court having in its memorandum of the same date found that there was substantial evidence that plaintiff was disabled to do work he was qualified to do, namely, manual labor.

On the reference, the Hearing Examiner held in effect a hearing de novo on the justification that further evidence of disability bore on claimant's employability; and received voluminous evidence on the question of disability as well as on that of the work available in claimant's community which he was qualified to do. In wading through the six hundred fifty pages, including forty-nine exhibits of which Collective Exhibit B–46 with 13 items in one, amassed in connection with the second hearing (over three times the size of the record from which the first appeal was taken), the Court was impressed with the presence of substantial evidence which tended to refute claimant's claim of full disability. This evidence, the Court feels it cannot ignore. It would be a travesty upon the Social Security Act to determine that claimant is entitled to a period of disability when, in fact, the new evidence raises grave doubts as to such disability. It is regrettable that the Sec-

retary's case was not as well presented at the first hearing.

In the complaint dated June 24, 1963, requesting a review of the earlier action of the Appeals Council:

"Claimant avers that he first injured his back about July or August 1948 while employed by Carbide & Carbon Chemical Corporation while lifting a heavy object; that following said injury he was retained on the job with a restriction against any lifting, his duties being the weighing of materials on 'gram scales'; that thereafter he was employed by the Tennessee Valley Authority and got his feet frozen in November 1950. As a result of his back injury and frozen feet his condition became progressively worse and he has been unable to work since 1951, although prior to 1951 he had always had regular employment.

"Claimant is advised and believes that he has a 'ruptured disc' and 'possibly two ruptured discs' in his back, and has arthritis in his back, legs, arms and neck, and he suffers from circulatory difficulties in his legs and feet, and from a right inguinal rupture, hemorrhoids and prostate trouble. Claimant suffers from gas on his stomache and is highly nervous. Claimant is unable to walk over a short distance, and loses control over his legs when on them for over 20 or 30 minutes, and these conditions have existed since 1951."

At the second hearing, the alleged injured back and frozen feet were stressed as the major bases of disability, although an alleged injury to the right hand was also emphasized. Other minor ailments were listed although it is doubtful that any go back to the 1952–54 period which controls.

In its earlier memorandum, the Court briefly sketched the main features of claimant's life and employment. There is new evidence on both, which it seems unnecessary to detail, unless the Court should reach the question of availability of employment opportunities. Our im-mediate concern is whether claimant has met the burden of proving his " * * * inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration. * * * "

There is a particular difficulty in this case because of the remoteness in time of the period for which claimant seeks to establish disability, namely the 1952–54 period. In his first application to establish a period of disability filed February 1, 1955, he claimed "left leg almost paralyzed unable to stand or sit very long." He noted that he lived on a 10-acre farm which he just watched over and upon which he did no work himself. In an application filed April 8, 1957, to establish disability, he listed his impairments as "bad back, bad left leg and bad right hand." He noted "If I try to lift anything my legs freeze and I can't walk. If stand on my left leg as much as 20 minutes it starts getting numb. Stiff right hand impaired use of it can't close fingers." He then stated, "Got my feet frozen." In the same application, in describing his daily activities, he said, "I wash dress and shave myself I work only two hours per day in my garden during the growing season not more than 1 hr 2 days per week." Referring to this item under "Remarks," he said, "I drive to church about 2 miles each way on country road the traffic is extremely light possibly twice per month. I sit around the rest of the time."

His current application filed 1–9–1961 was not filled out except as to name, social security number, date of birth, the checking of a few boxes, signature and address. No data as to his impairments was supplied but written diagonally across that sheet was the notation "See old file."

We have gone into this bit of history to try to pinpoint the impairments he claimed at the date near the critical period. They seem to be, his back injury with related effects upon his lower limbs,

his frozen or frost-bitten feet and bad right hand.

It will be remembered that the major back injury occurred on November 17, 1948 when claimant strained his back trying to move a 300 pound object onto the prongs of a fork lift while working for Union Carbide, that he was thereafter transferred to another job and continued work until a reduction of force occurred in March, 1949; that in July, 1950, he went to work in a steel mill in Indiana as a "sweeper" but had to quit because of back trouble since the job involved other duties than sweeping; that in October of that year he secured employment with TVA digging post holes, excavating for and installing log anchors, repairing fences, etc., during which period he sustained frost bitten feet; but his termination occurred later, in April, 1951, because of job completion. Later in May, 1952, he got a job as a watchman and hurt his hand while assisting with the removal of the cover of a concrete mixer. His last regular employment was with TVA.

Without controverting the findings in our earlier opinion filed on May 6, 1964, we are trying in this memorandum to bring into focus the evidence relating to claimant's condition during the critical period. He was examined numerous times at the Penn Clinic after the back injury connected with the fork lift incident.

In a report filed January 11, 1951, Dr. Herschel Penn, after referring to previous examinations, commented, claimant has never complained of severe pain but of a dull and aching pain, situated lumbosacral with radiating down both lower extremities but more severe on left. He claimed it to be aggravated by activity and has prevented his working. Dr. Penn expressed belief in the sincerity of claimant and thought surgical intervention was indicated to decompress the nerve root and provide a fusion. He thought it would alleviate his symptoms and allow him to return to work.

It is singular that between his alleged injury and the aforementioned report he obtained a job at hard physical labor with the TVA; that he reported no physical defects, and no limitations were placed on his work by TVA physicians following examinations. Almost at the identical time he was entering upon his employment with TVA, namely on October 15, 1951, he was settling his claim for his back injury in this Court against Carbide and Carbon Chemicals Company and Aetna Casualty for the sum of $500.00. Even assuming that there was a question whether his suit was timely brought because of the running of the statute of limitations, it seems strange to the Court that an injury which he claims to have been disabling should have been settled for what is virtually a miminal amount.

In December, 1948, Dr. Herschel Penn had found no objective evidence of low back pathology. On January 21, 1949, he reported "There is still not specific evidence any traumatic lesion or nerve pressure. * * * I do not believe there is any evidence of a ruptured disc, nerve root pressure or any other traumatic pathology." In April, 1949, Dr. E. S. Clayton found nothing sufficient "to account for the degree of pain or disability of which Mr. Stephens complains." On July 15, 1949, Dr. Augustine found no remarkable difference in the diameter of claimant's calves and thighs. X-rays showed the lumbar spine and pelvis to be intact with no significant pathology. He could not support an orthopedic diagnosis. Dr. Bourkard on May 15, 1950 reported "X-rays of the dorsal and lumbar spine reveal no pathology as a result of injury in the bones or joints. There was moderate lumbosacral narrowing." He concluded the most he could have sustained as a result of injury was a low back sprain. The Bagwell-Brashear Clinic reported on March 25, 1950 "a chronic low back strain." "X-rays were negative except for narrowing of the lumbo-sacral joint."

It should be noted that in Dr. Penn's sympathetic appraisal of claimant's condition on January 11, 1951, there was no medically determinable physical impairment. At the time of hospitalization in

the United States Public Health Hospital in Baltimore, April, 1952, for his frost-bitten feet, he had said "he had no back or back trouble whatsoever." This report will be discussed at greater length later. On November 10, 1959, Dr. Penn wrote a "To Whom It May Concern" note, saying he thought claimant "could not do laborious work"—but in the first paragraph it is to be noted this opinion was not based on a medically determinable physical impairment since the surgery recommended was to be exploratory in nature.

Doctor W. Eidson Smith, a neurosurgeon, reported to claimant on July 21, 1954, "It was my *feeling* that your history and findings were *compatible* with a herniated nucleus pulposus at L5." (Emphasis added.) This conclusionary "feeling" was hardly based upon a medically determinable physical impairment.

Doctor Smith saw him again in 1959—five years after the critical period. He found no evidence of neurologic abnormality—and no change since 1953 (sic). He felt the basic difficulty was functional with changes from hypertrophic arthritis. He concluded if there had been no recent orthopedic examination it would be worth while to x-ray the spine.

Doctor Vernon Smith in March, 1963, was of the opinion claimant had a "chronic low back strain" with "possibly" disc injury between L–5 and S–1. He did say he thought claimant was totally and permanently disabled to do "hard labor work"—but did not relate the conclusion to the critical period.

In connection with a claim for compensation as a Federal employee, he was hospitalized at the request of the Bureau of Employees' Compensation at the U. S. Public Health Hospital, Baltimore, Maryland. He was in this hospital for twelve days—being admitted on April 22, 1952 and discharged on May 3, 1952, which was during the critical period. The report was signed by Norman Tarr, S. A. Surg. We give special weight to it because of the picture of claimant at that time. He had previously been hospitalized for two weeks in late June and July,

1951 at the same hospital. On both visits he had complained of foot trouble because of frost bite. In its report at the result of the second hospitalization, the examiners found no abnormalities of the lower extremities except some ecchymotic mocules (black and blue marks). The following paragraph of the report is significant:

"At the present time the patient has the same complaints. He states that he is unable to hold down a job but he does work around the house a little bit. The patient seems evasive and incomplete in details of his history and would not state certain facts until pinned down. For example, he states that he was in perfectly good health until the present illness and he was getting along quite well. However, on further detail questioning he admitted that he had had back trouble and that he had a lawsuit because of this back case and he settled with the insurance company and did not carry the law suit into court. At the present time he states that he had no back pain or back trouble whatsoever."

With respect to his extremities, the report states he was evaluated several times and showed no vascular changes. The evaluation at Surgical Staff meeting was that he "probably had an early arteriosclerosis obliterans which was not the result of his work and was not made worse by the episode of the exposure to cold that he complains of. * * * that he is capable of doing a regular type of duty if he wishes to."

This report is at odds with Dr. Neuenschwander's report of February 12, 1952, that he had "1. Low back injury. 2. Peripheral vascular disease involving the feet and possibly the hand."

It should be noted that the Bureau of Employees' Compensation following an investigation on July 10, 1952, denied any compensation because of frost bite after October 1, 1951 up to which time he had been paid $687.43. The reason given was that claimant was not disabled for work after that date because of this injury.

Claimant was seen by Dr. Willien on September 23, 1952 who noted he walked quite carefully as though both feet were painful—but he said the color was satisfactory, and although cold to the touch there was no marked limitation of flexion.

With respect to his crippled hands, he was asked at the July 14, 1959 hearings, "Q. Of course, the arthritis in your hands, you could use your hands without too much trouble?" and he answered, "Well, I guess I could." Previously at the same hearing he had testified, "Yes, I've got a crippled hand, but it is minor though with my other trouble. I don't think much about that."

There seems to be little doubt that claimant sustained an injury to his hand in the concrete mixer incident in May 1952 and perhaps sustained a permanent partial disability in that there was stiffness and some impairment in closing all his fingers, but on the issue before the Court we think that the evidence sustains claimant's own appraisal of July 14, 1959 of the minor nature of his hand injury and Dr. Bishop in a "To Whom It May Concern" statement on February 6, 1963, did not mention the hand or feet.

Medical examinations were made of claimant in 1964 and 1965. Dr. Penn stated that had claimant had a successful laminectomy and decompression of involved roots he could not have returned to heavy physical labor.

Doctor Sidney Wallace of the Penn Clinic saw claimant in April, 1965. He found "(1) Partial ankylosis of the right shoulder. (2) Functional disability of the right hand. (3) Degenerative disc disease at L–5–S–1." He concluded that he had a physiologically functional right hand. He said he had a disability in his back which would restrict heavy lifting—but not sedentary type activity. He found no consequential peripheral vascular disease of lower extremities.

Doctor Fred Brown made a neurological examination in April, 1965 and filed a lengthy report. Referring to a request of Hearing Examiner Cadra, Dr. Brown wrote in part with respect to the three major complaints of which we have spoken:

"He asked for a functional evaluation of the lower extremities including any peripheral vascular condition. This man's skin and nails of the lower extremities are normal. There is no complaint of change of color and there is no change of color in the upright position or lying down. He has a perfectly normal dorsalis pedis pulse bilaterally. In my opinion, no further vascular tests are necessary. Again, this man's functional responses would tend to mask any disability, if indeed it were present. On the other hand, he didn't exert the strength in the left lower extremity sufficiently to even support his own weight while I was testing him, so this is hard to evaluate. In view of the lack of any changes over the years in the lower extremities and the very marked functional changes, it is my opinion that again, he can use the left lower extremity and the right lower extremity for anything other than the heaviest lifting or extended walking. He asked about nerve root pressure and I have to say again that all we can say is that the very marked functional changes mask this. Before starting the history and the examination, I talked to this patient for several minutes explaining to him that if he tried to exaggerate in any way or tried to fool me in any way, I would almost certainly be able to tell it and it would hurt his report. He said that he understood this and he would not exaggerate in any fashion. Still, I got this very marked functional response.

"In trying to evaluate this patient 10 years ago, we can say that when he was examined by Dr. Smith in 1954, he thought that there was a ruptured disc at L–5 and that it should be explored but when he saw him again in 1959, he felt that it was primarily a functional response and he had changed his opinion. Personally, I feel that the failure to have something done about by the patient points toward a very large

588

functional difficulty at that time. The objective findings do not support Mr. Stephens' allegation of loss of grip in the right hand. He could raise the hand above shoulder level by moving his scapula in spite of the restriction of movement of the shoulder joint and while he may be extending his fullest cooperation, this is the whole question which has to be determined in view of the very marked functional responses. I would say that in general, the findings following the back injury some 10 years ago would be those of some degree of narrowing of the lumbar sacral disc and osteoarthritis and that this can get worse slowly but in Mr. Stephens' case, as well as one can judge at the present time, it has not gotten any worse and may actually have improved. Certainly, all of us will agree that with advancing age, the arthritic processes in the lumbar spine slowly become worse. This could be checked by having new x-rays made of the lumbar spine and comparing them with the older ones. It cannot be checked by examining the patient since he is showing us so much in the way of functional responses. * * * "

Doctor C. Harwell Dabbs in April, 1959, examined claimant particularly for arterial or venous disease. We quote in part from his report:

" * * * There is, furthermore, no evidence of any obstruction, on either side, with normal amplitude of pulsations in the calves and feet. There is, in short, no objective evidence of any vascular disease in the lower extremities.

"While the history of frost bite and the findings noted at that time suggested that the patient did have acute pernio, he has none of the stigmata associated with chronic pernio, and no evidence of arterio sclerosis obliterans."

After the frost bitten feet incident in 1951, claimant sought compensation and Mr. S. W. Stone investigated for the Bureau of Employees' Compensation. The first two sentences of his extensive report dated October 25, 1951 were as follows:

"Claimant was first contacted by this investigator on September 17, 1951 and he stated that he had just arrived home from helping a neighbor haul a load of hay. This I already had knowledge of, for I had stopped at his neighbors home to make inquiry as to where the claimant (sic), and the neighbor informed me that the claimant had just gone to his home, that they had just finished hauling a load of hay. * * * "

When questioned about this incident at the hearings, claimant was very evasive and unresponsive.

■■ On this and other evidence in this voluminous record, not adverted to in our opinion, the Hearing Examiner concluded that claimant had failed to demonstrate that he was unable, by reason of a physical or mental impairment, to perform any of the types of jobs he previously did. On the basis of the additional evidence we have recounted, the Court is inclined to agree with the Examiner's conclusion. However, the Court retains a lurking doubt whether claimant was as good as ever after the injuries, and it was because of the same doubt earlier that the cause was remanded. Although it does not fully concur with the Examiner's conclusion as to the physical impairments it does concur on the basis of Dr. J. J. Ray's testimony, he being a competent and experienced management consultant and industrial psychologist, that claimant was able to perform other substantial gainful work which was available to him in the locality where he lived, and the Court agrees with the Examiner and concludes that claimant is not entitled to disability benefits on the basis of the application in question.

In reaching this conclusion, the Court would like to clarify its understanding of the meaning of the word "available" as used in this context. In stating that jobs claimant could perform were

"available" in this community, the Court does not understand that claimant could land such a job. Indeed, Mr. Ray who was an enlightening and candid witness said frankly several times that the job opportunities for a man like claimant were very limited, and the possibilities of his obtaining employment in his home town of Lake City were nil and in nearby Clinton and LaFollette were very questionable. At one point, he testified he was not a job expert and would not argue about what types of jobs the man could hold, but said on the basis of his examination claimant had a great deal of physical potential that will enable him to do most jobs. Earlier he had testified that because of the very low level of claimant's motivation, arising from despondency, discouragement, pessimistic outlook, etc., the possibilities for the future were also low.

In the same vein, Mr. David E. Cosmah, business representative for the Knoxville Building and Construction Trades Council testified in his opinion there were no jobs in the construction field that would fit the man's capabilities. He would not recommend a man with a medical record like claimant's to a contractor without telling him about it, because in his opinion a man with his record could not give a days work for a days pay.

Mr. C. A. Proffitt, Secretary-Treasurer of the laborer's local union, testified it would be very difficult to place claimant as a laborer because of his disability, that contractors don't want a disabled man, or as they say, the "sick, lazy and blind."

The Court is aware that Messrs. Cosmah and Proffitt represent unions supplying men in the rough and tumble of the construction world and that claimant could not in his present condition find work of that kind.

■ And yet, Dr. Ray said jobs were "available." As we understand the word in this context, it is used to refer to jobs of a type which exist in a community, which a man of plaintiff's disability, all things else being equal, could fill and perform. Massey v. Celebrezze, 345 F.2d 146, 155 (C.A. 6); Jones v. Celebrezze, 321 F.2d 192 (C.A. 6); May v. Gardner, 362 F.2d 616 (C.A. 6, June 30, 1966). It does not mean that he could secure such a job. It does mean a job that a man of his physical potential (after his disabilities are evaluated) could fill. When the word "available" is used it does not mean that an opening necessarily exists, or that claimant could walk out tomorrow and obtain a job he could do.

■ As we understand the Act, a claimant is entitled to disability payments because he is disabled; and not because he is out of work, has some physical impairments, or because a job is almost impossible to find. We do not understand that social security is an unemployment compensation law. Hicks v. Flemming, 302 F.2d 470, 473 (C.A. 5). As the Court said in that case:

> "The hardship here seems to be more in Hicks's inability to find employment than in his incapacity to work. Despite our natural sympathy for Hicks's plight, we cannot order unemployment compensation under the guise of disability insurance. We hold that the administrative officers were justified in this case in finding that Hicks was not under a disability preventing him from engaging in 'any substantial, gainful activity'."

"The question in Social Security cases relates to whether a man can work, and not whether he can find a job in his area." Robinson v. Celebrezze, 326 F.2d 840, 841 (C.A. 5).

■ The Court does understand the word to mean that if jobs of the kind plaintiff could physically perform existed in the community (even though all at any given moment or over a considerable time were filled) they were still "available" in his community. Claimant is not guaranteed a job under Social Security, he will only be paid compensation if he is "disabled" within the meaning of the Act.

The motion of the Government for a summary judgment is granted.