William T. MIRACLE, Plaintiff-Appellant,

v.

Anthony J. CELEBREZZE, Secretary of
Health, Education, and Welfare,
Defendant-Appellee.

No. 15992.

United States Court of Appeals
Sixth Circuit.

Sept. 16, 1965.

 

life was one of hard labor. He came from Cubbage, a mountain village at the head of Brownie's Creek, a hollow in Bell County, Kentucky. This is a part of what is called Appalachia, one of the areas of our country afflicted, for a considerable time in the past, with unemployment and consequent poverty. Appellant, however, at different periods of his life sought and found employment not only in Kentucky, but in Tennessee, Kansas, and Ohio.

When he started to work, as a boy of sixteen, it was with the L&N Railroad, cutting and logging timbers and making mining props. He was afterward employed in hauling logs and then he worked on his own, splitting the timbers with iron wedges and steel hammers, subsequently selling the timbers to the mines. He also hired men to do the same work that he was doing and paid them by the day. He hauled the logs out of the woods with horses and mules which he came to own, and afterward sawed the logs. Thereafter, he went back home and made timbers for the mines; and their trucks would come and get them. He then worked for a company "road-swamping" —clearing roads up to the logs so that the teams could get through to them. After that, he worked for a powder plant, unloading lumber off the cars. At that time he hurt his back while he was carrying a heavy piece of timber and his feet slipped on the frozen sleet. Later, he went into construction work, building conveyor lines and houses up to the mines and tipples down at the railroad. He was only a common laborer in performing this work. When he built tipples, he used hand saws, electric drills, and carpenter's hand tools. During these two years, his work was very satisfactory, according to his supervisor. Appellant stated: "They showed me the figures on the square they wanted the timber cut on like that but I can't say I am a carpenter." Afterward, he worked for his brother in the woods for two or three months, and then began driving a bus for him. In the woods he cut roads and hauled logs. When the mines "went slack" in 1955, and he lost

Daniel J. Tribell, Middlesboro, Ky., for appellant.

Charles G. Heyd, Asst. U. S. Atty., Cincinnati, Ohio, Joseph P. Kinneary, U. S. Atty., Cincinnati, Ohio, on brief, for appellee.

Before CECIL and O'SULLIVAN, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

This is an appeal from an order of the district court dismissing appellant's claim for disability benefits under Section 205(g) of the Social Security Act.

The background of the case is as follows: Appellant, William T. Miracle, is now a man fifty-six years old. He finished the second grade at school and started the third grade, which he did not complete. He got only that far up to the age of eighteen, because he had to work helping his father to support the family and, therefore, could go to school only a very little from time to time. As he stated: "I was practically grown before I got to go to school." He could never hold down a job requiring the slightest reading or writing. From childhood, his

his job there, he started trucking logs and buying them. Later, he moved from Kentucky to Tennessee and afterward traded his place in Kentucky for one in Tennessee, where he was able to sell a truckload of timbers a month. He also had some pine on his place which he sold for pulp wood. After about two years, in 1959, when, as appellant said, he became "disable to work" he moved to Ohio and sought work in September 1959, after telling his employer that he was unable to do any lifting. He started work, sweeping the floors and dusting machinery. His eyesight was bad and he could not competently sweep or dust. This work was too much for him.

He afterward assisted in unloading some cars. This, he also was unable to do. Although he was paid $1.25 an hour, he could not hold down the job because, as he claimed, of the pain resulting from his spinal condition. In fact, he was discharged on the ground that he could not do the work. His employer, however, after trying him in these different jobs and finding that he could not do the dusting, sweeping, or lifting work, kept him on for two or three months "out of sympathy" as his employer stated, and they parted on friendly terms.

There were two hearings and two decisions in the administrative proceedings in the case. In the first hearing, on September 30, 1960, Edward Moeller, the Hearing Examiner, after reciting certain evidence relating to appellant's osteoarthritis and abnormalities of the cervical and lumbo sacral spine, held that the medical evidence did not disclose that appellant's impairments were of sufficient severity as to preclude all substantial gainful activity and that, while such evidence might indicate that appellant may not be able to tolerate hard manual labor, there appeared to be no restriction on moderate work activity; and the Hearing Examiner, in consideration of the foregoing, decided that appellant was not entitled to disability benefits. Appellant then sought review before the Appeals Council; and his request for review was denied on the

ground that "a formal review of the Hearing Examiner's decision would result in no advantage to the claimant."

Appellant then filed a complaint in the district court on the ground that the findings of the Hearing Examiner and the affirmance thereof by the Appeals Council were erroneous. He asked the court to reverse the findings and decision and determine that appellant was entitled to disability benefits. However, after the filing of appellant's complaint in the district court, since there was no evidence to substantiate the Hearing Examiner's holding that appellant's impairments were not of sufficient severity as to preclude all substantial gainful activity, in that there was no evidence of what kind of work appellant could perform, and what practical opportunities there were for a man afflicted as he was, counsel for appellant moved to remand the cause for the purpose of taking further evidence on the ground that there was "a total absence of evidence as to the employment opportunities available to a man who can do only what the plaintiff, Mr. Miracle, can do." In accordance with our former rulings, the district court found appellant's motion well taken, denied the government's motion for a summary judgment, and entered an order remanding the case to the Secretary of Health, Education and Welfare "for the purpose of taking further evidence as to the following issues:

"A. What can the plaintiff do?

"B. What employment opportunities are there for a man who can do only what the plaintiff can do."

On the remand, a different Hearing Examiner, J. C. Goodwin, on January 28, 1963, considered the prior testimony and proofs, took additional testimony and proofs and, in his recommended decision (which was adopted by the Appeals Council), found that appellant had not established that he had impairments of sufficient severity as to preclude him from engaging in any substantial gainful activity, at any time he met the special earnings requirement of the Act, and con-

tinuing thereafter through the date his application was filed.

We come then to the controlling consideration in the case—appellant's spinal condition and his pain, and whether he was able to engage in substantial gainful employment.

At the outset of the Hearing Examiner's recommended decision on the second hearing, which formed the basis of the decision of the Appeals Council and of the district court denying appellant disability benefits, the Hearing Examiner stated to appellant: "The rules of evidence are not followed here, as you were probably advised in your former hearing, because I am primarily interested in obtaining all of the facts. * * " The Social Security Act must be administered with much informality, and the satisfaction of the claimant's statutory burden is to be judged in a practical way. Fowler v. Ribicoff, 197 F.Supp. 508 (D.C. W.D. So. Carolina). On the hearing, various statements of physicians and others were marked as exhibits and considered as evidence, although those who made the statements were not sworn as witnesses, and, in many cases, statements, not made in the ordinary course of business or the keeping of records, were also marked as exhibits and considered in evidence. This is the customary informal way of hearing a case for disability benefits under the Social Security Act, and we mention it only to indicate that, on review, we consider the same statements as evidence in a like manner as did the Hearing Examiner and the Appeals Council.

On the second hearing, after remand, J. C. Goodwin, Hearing Examiner, in his decision stated: "There was a history of two previous injuries, one in 1937 when he was pushing a cart in the coal mines and fell down and hurt his back, and another injury in 1942, when he was lifting timber."

In a statement made by Dr. Charles B. Stacy, M.D., of Pineville, Kentucky, on August 22, 1958, he reported:

"Mr. W. T. Miracle has been treated by me over a period of time and

on 7/15/58 another x-ray was taken of the lumbar vertebrae. This showed a 6th lumbar vertebra with sacralization of the transverse process of the last vertebra on the left side. There is hypertrophic spurring representing an arthritic process.

"He was seen here at the hospital clinic in 1950 by Dr. Willien, the orthopedic consultant who believed he had osteoarthritis with probable disc lesion. He recommended and fitted a low back brace which he now wears. He states he cannot do his usual work such as farm work without considerable pain. *Undoubtedly he is disabled.*" (Emphasis supplied.)

On July 29, 1959, Dr. Stacy again examined appellant and rendered a medical report, stating that appellant's injury occurred in July 1958; that his subjective symptoms were "pain in back," radiating to cervical region, also pain in lumbar region; that his diagnosis was "chronic osteoarthritis of spine"; that appellant used salicylates; and wore a low back brace; that X-rays showed spinal abnormality and osteoarthritis.

On October 2, 1959, Dr. William L. Patterson, M.D., of Knoxville, Tennessee, examined appellant for the Kentucky Bureau of Rehabilitation Services, for the Social Security Administration, and reported that appellant stated he had injured his back in 1937 and in 1949, and had worn a brace since 1952; that his pain was chiefly in the upper lumbar spine, "which he says goes into the upper dorsal and occipital area of the neck." Dr. Patterson further reported that: "On examination, the patient was tender over the 10th dorsal vertebral body, and there was left paravertebral muscle spasm. * * * He had 20 per cent restriction of lateral flexion of the lumbar spine. * * * X-rays taken on October 2, 1959, of the lumbar spine showed moderately advanced osteoarthritis between D–11, and D–12, which is compatible with an old injury. The intervertebral disc space between these two verte-

brae was slightly narrowed. The patient was slightly obese. He did not seem to be in marked difficulty, but it would be awfully hard to say that he is not having back pain due to the arthritic condition which is present. *I doubt seriously if he would be able to tolerate hard manual work at his age [51 years] and with the arthritic changes noted on the X-rays.*" (Emphasis supplied.)

On August 26, 1960, Dr. Bernard C. Dienger, M.D., in an ophthalmological consultative examination, stated:

"Mr. Miracle was examined at this office on August 24, 1960 with the history of decreasing vision since 1949. In September of that year he suffered an injury to the left eye while working in a coal tipple; resulting in scar of cornea of the left eye.

"Mr. Miracle worked as a janitor up until March of 1960, but lost his position because of poor vision and also because of a bad back."

He further reported that the ocular pathology primarily responsible for appellant's impaired vision was: "Peri macular degeneration in both eyes" and that the secondary pathological condition was: "chorio-retinitis inferior temporal quadrant" and "chorio-retinitis central"; and that the history of his eye injury was "Coal dust scar in left eye, no residual scar noted." He reported appellant's visual efficiency as a 14% loss in his right eye, and a 36% loss in his left eye.

On September 9, 1960, appellant was given an additional orthopedic examination by Dr. John R. Levitas, M.D., in Cincinnati. Dr. Levitas had seen appellant eleven days before the day of the examination and stated that appellant had worn a back brace since 1959. This was obviously erroneous as the other doctors who had examined appellant many years before stated that he had been wearing a back brace for ten to twelve years, at the time of those examinations. Dr. Levitas further stated:

"Physical examination revealed tenderness along the *entire* spine, cervical to the sacrum. There was apparent limitation of cervical flexions, about 20%, and extension about 50%. Lumbar spine flexion and extension were both about 25% limited. Rotatory motion and other motions were normal. Shoulder motion was full, but caused discomfort at the extreme of abduction. Straight leg raising produced discomfort in the low and midback at about 130° bilaterally (about 75% of normal). Chest expansion was 1-½". There was no other joint involvement. Neurological examination revealed hypoesthesia to pinprick throughout both upper extremities. * * *

"X-rays of the cervical spine revealed fusion of the bodies of C4, C5, C6, and possibly C7. X-rays of the thoracic spine were normal. X-rays of the lumbosacral spine revealed a transitional vertebra between L5 and S1, (or S2). These radiological changes are congenital in origin and not traumatic.

"Impression: Chronic low back strain
Congenital abnormalities of cervical and lumbosacral spine.

"The patient's history and subjective response to portions of the examination, lead me to feel there is a large psychosomatic element to his complaints."[1]

Later, on November 23, 1960, Dr. Levitas made another examination of appellant, and reported:

"I have examined Mr. Miracle on 8-20-60 & again on this date and feel he has a chronic lumbrosacral strain with psychosomatic overlay which results in a permanent partial disability of 20%."

1. Hypoesthesia is defined as an imperfect power of sensation.

On November 26, 1960, Dr. H. O. Beeman, M.D., of Norwood, Ohio, stated the following:

"This is to advise that I have treated Mr. Wm. Miracle, 1914 Cleneay Ave., Norwood 12, Ohio, since Feb. of this year. Medications have been primarily muscle relaxants and, on occasion, something for pain. *I believe Mr. Miracle has a chronic back complaint which is incapacitating in so far as steady gainful work is concerned.* I feel too that there may be a psychosomatic element associated with some of his complaints. I feel that he should be accorded every consideration for some monetary assistance." (Emphasis supplied.)

On November 14, 1961, Dr. Adam Stacy, Jr., M.D., examined appellant for the Kentucky Department of Economic Security, Division of Public Assistance, and reported that appellant had gland trouble, sinus trouble, and a dead kidney, He also reported that appellant's neck was extremely limited in motion to right, left, and in all directions; that all of these movements were made with pain; and that the motion of his back was limited in all directions with about 30% forward flexion. Dr. Adam Stacy's diagnosis was "arthritis, old cervical vertebra, thoracic and lumbar vertebrae, severe."

On January 27, 1961, Dr. Leonard J. Stark, M.D., performed an orthopedic examination on appellant and took X-rays, and made the following report:

"This patient is a fifty-three (53) year old man who is well developed and co-operative. He appeared tense and anxious throughout the examination. He is wearing a steel spinal brace which extends from his pelvis to his shoulders. This brace shows considerable wearing and is in need of repair. The cervical spine is tender along the left side from the 3rd through the 7th vertebra. Rotation of the neck toward the right and left sides is limited 25% and is also painful. The upper extremities show no abnormality. X-rays of the cervical spine show a congenital fusion of the 4th, 5th and 6th vertebrae. This segment of the spine is abnormally straight and rigid.

"The lumbar spine shows 15% limitation of forward bending. In the flexed position he is able to reach a point 9 inches from his toes. Backward bending is limited 20% and associated with low back pain. On palpation of his back, he does not complain of tenderness. Straight leg raising tests show elevation to 100 degrees on both sides without sciatica. The lower extremities show normal reflexes, sensation and muscle power. X-rays of the lumbosacral spine reveal the presence of a congenital variation in structure of the 5th lumbar vertebra. There is enlarged transverse process on the left side which articulates with the ilium. There are large spurs on the bodies of the lumbar vertebrae indicating the presence of degenerative arthritis.

OPINION: This man was born with congenital abnormalities in both the cervical and lumbar regions of his spine. He performed hard labor in the Kentucky coal mines and on other jobs. There have been three specific episodes of injury to his back as outlined in the report above. In 1949, he had an orthopaedic examination by a very competent doctor and a spinal brace was prescribed. He has worn this brace steadily, and apparently is dependent upon it to support his back. There is no question but that this man has a physical disability. In addition, he is anxious and worried because of the nature of his disability, the pain he suffers, and his inability to earn a living. On the basis of the physical examination, he has a *moderately high disability which I estimate to be 60%. He is totally unable to perform the type of work which he had*

*done previously and from a practical standpoint he is not employable."* (Emphasis supplied.)

On December 12, 1961, Virginia Chambers, a field worker for Bell County, Kentucky, rendered a Social Data Report in which she stated that appellant wore a steel back brace twenty-one inches long; that he stated he took medicine for pain all of the time; that he "seems to think he is not getting any better but is really getting worse all of the time. *He does not seem to exaggerate his condition to attract attention or to get sympathy.* His wife is worried about his condition. *He has tried to be independent as long as he could in the past."* (Emphasis supplied.) Miss Chambers further reported:

"Rehabilitation in Cincinnati and Good Will Industries in Cincinnati were not able to do anything for him. It is doubtful if anything could be undertaken for him—due to lack of education and age; but he would have been willing if they could have done anything for him. There probably is no type of work in his community which he feels he is able to do in his condition. Work accessible in the area includes strip mining * * * [and] road work on the highway.

"Due to limitations of back there is probably no work which is accessible to him that he is able to do; logging is available but he cannot do it. * * * It seems to this worker that he is limited considerably in motion and he states he is in constant pain—which runs up the back of his neck; that he has numbness and that he is nervous and takes a great deal of medicine for pain."

On October 4, 1962, Dr. Beeman again reported to the District Manager of the Bureau of Old Age and Survivors Insurance of the Department of Health, Education and Welfare, in reply to their request for information:

"I do not feel competent to give you a full and accurate evaluation of this man's physical condition. It is true that I saw him several times at the office. But I felt that to really check out his complaints he should have benefit of consultation with a Neurologist, Orthopedic Surgeon and perhaps a Psychiatrist. I mention the latter because I felt there was a fair degree of anxiety present.

"History of injury that precipitated the major portion of his complaints stems from 1937 and with this length of time intervening many changes could have taken place. His chief complaint has been one of back distress associated with severe head pains. *The latter incapacitating at time.* With a family to support and unable to hold a job the anxiety present is understandable.

"I saw Mr. Miracle for the first time Feb. 13, 1960. At that time his B.P. was 156/80; Heart neg., chest clear and Ur. neg. I saw him afterward on Mar. 22, Aug. 12, Oct. 3 & 29, Nov. 21, 1960; Jan. 14, Feb. 11, Mar. 18, June 2 & 19, '61. He received during that time Dartal, Mellaril, Soma, Analexin & Norflex; Percodan, Deroon Comp. & Delenor for pain; and on occasion a mild sedative. *None of the medications appeared to help appreciably."* (Emphasis supplied.)

On October 27, 1960, the Ohio Valley Good Will Industries Rehabilitation Center reported that appellant came to the Center, stating that he was interested in getting some kind of work; that he had a major disability of a slipped disc dating back to 1937; that he had been working at the Keidel Supply Company but was laid off because the work was too heavy for him. The Rehabilitation Center informed appellant that they had no job open but would keep him in mind; but he never heard from them again.

On May 21, 1962, the Bureau of Vocational Rehabilitation of the Ohio State Board of Education wrote to the Social Security Administration stating:

"Referral of Mr. Miracle to this office was made by the Disability Determination Section, O.A.S.I. on

Form 853, September 19, 1960. The D.D.S. medical data were reviewed by our Field Medical Consultant, who determined that Mr. Miracle did not have a disability resulting in material limitation of activity."

Short Shrift.

On January 8, 1963, Dr. R. B. Baird, Jr., M.D., reported:

"The above has been examined by the undersigned and gives history of having ceased work back in December 31, 1959 and at which time he had an injury to his back in Norwood, Ohio. He was treated both in Norwood and in this area by Dr. P. W. Adkins of Pineville, Kentucky. He was first seen in this office with complaints of back pain on 6-29-62, complaint of severe pain in his back with pain down the back of both legs. After a discussion of his complaints and a physical examination it was felt that he suffers arthritis of the spine and a ruptured intravertebral disc probably between L4 and L5.

"He is also extremely psychoneurotic and is obviously cerebraly deficient, *it is felt for these reasons that he is totally and permanently disabled for any kind of gainful employment.* Regardless of whether work is available to this man or not, this examiner feels that his deficiency from the cerebral standpoint would prevent him from gainful employment.

"It is felt that this man is certainly due any benefits due him from the Social Security Act." (Emphasis supplied.)

On April 15, 1960, the Administrator of the Ohio Bureau of Unemployment Compensation stated with reference to appellant's discharge by the Keidel Supply Company as follows:

"Claimant was discharged by the Keidel Supply Co., because the claimant lacked the qualifications necessary to perform the job to the satisfaction of the employer. These facts do not establish that there was any misconduct or *wilful neglect* on the part of the claimant." (Emphasis supplied.)

On January 27, 1962, Mr. Arthur Keidel submitted to the Social Security Administration a statement with regard to appellant's employment with the Keidel Supply Company, in which he said:

"William T. Miracle worked for the Keidel Supply Co. Inc. from 9/11/59 to 3/8/60. He said when he applied for a job that he could do only light work. He was given a job as a porter with duties to mop the offices and stores, he also was responsible for washing the windows and general sweeping up and keeping the place clean. *His work was not satisfactory in as much as he didn't keep the areas clean.* He was sent to light shipping and receiving. His duties consisted of loading and unloading the trucks that come into the yard. He didn't work out there either as there wasn't much work for him to do. *He was kept on out of sympathy for a few months. His work was terminated under mutual consent. He couldn't do the job and we parted company on a friendly basis.* He did not injure his back working for us. He was paid at the rate of $1.25 an hr. *He was a fairly steady employee. He was here but we couldn't get him to do anything.* He could not handle any type of work that required reading or writing." (Emphasis supplied.)

Subsequent to the remand and about a year after Mr. Keidel's statement, for some undisclosed reason, the Social Security Administration prepared another statement for Mr. Keidel to sign, which did not contradict the first statement but the phrasing was changed and the sequence of the facts was altered, giving a somewhat different emphasis to the statement. As an instance, in the second statement it stated that the property of the company covered thirty thousand square feet which appellant walked around daily. This, obviously, was to show appellant had no difficulties in

walking long distances, a fact that was later virtually cancelled out in the Hearing Examiner's decision. Although it stated that appellant had told Mr. Keidel that he could not do any lifting, the statement went on to say that he moved cans around weighing fifty pounds apiece, and that he bent over in order to pick up filled wastepaper cans and cartons in the receiving department. This fact was also virtually withdrawn in the Hearing Examiner's decision. Instead of the prior statement of the employer that appellant was kept on out of sympathy for a few months, at $200 a month, that his work was terminated under mutual consent, and that they parted on a friendly basis because he could not do the work, the second statement of Mr. Keidel, prepared for his signature by a representative of the Appeals Council, stated: "I frankly don't remember why his services terminated."

On the first hearing, the decision of the Hearing Examiner stated: "After carefully considering all of the evidence in this case, the hearing examiner finds that the medical evidence does not establish claimant's impairments to be of sufficient severity as to preclude all substantial gainful activity. * * * While the medical evidence may indicate that claimant may not be able to tolerate hard manual labor, there appears to be no restriction on moderate work activity."

The foregoing decision, as heretofore mentioned, was reversed by the district court for the reason that there was a complete absence of proof of any work that appellant could do, as well as a complete absence of proof of what employment opportunities there were for a man who could do only what the appellant could do.

In the determination of the Hearing Examiner on the second hearing, on which the decision of the Appeals Council and the district court is based, the ground upon which the decision is based is stated as follows:

"It is apparent that the claimant's inability to engage in any employment does not stem from any severe-ly incapacitating condition *but stems rather from the pain from which he states that he suffers as a result of his impairment.  However, pain is a subjective matter, difficult to evaluate, and usually is not, in itself, sufficient to establish a period of disability under the Act.*  It would appear that the claimant's impairment and pain may bar him from certain types of employment which require excessive physical exertion. *Furthermore, even a light or sedentary type of job may entail pain and discomfort.*  But 'it is to be presumed that any appreciable degree of disability is attended by discomfort, pain, or, at least, by inconvenience and handicap in the discharge of the normal activities of life. * * *'

"In view of claimant's demonstrated residual abilities and continuing activities, * * * the Hearing Examiner finds that there are many types of employment in which claimant could engage, and that such employment is found generally in the economy of small towns and rural areas such as the one in which claimant lives.  Such jobs * * * are well within claimant's residual capabilities, some of them require a minimal amount of training and others require none, and they are all light, non-strenuous work entailing a minimum of prolonged standing, walking, or stooping."  (Emphasis supplied.)

Appellant's physical condition is a litany of pain.

To sum up: Dr. John R. Levitas, a specialist in orthopedic surgery, who examined appellant at the request of an agency representing appellee Secretary, stated that "Physical examination revealed tenderness along the *entire* spine, cervical to the sacrum."

Dr. H. O. Beeman stated that appellant's chief complaint had been one of back distress, associated with severe head pains; and that he had received, for the alleviation of his pain and nervous distress, Dartal, Mellaril, Soma, Analexin,

Norflex, Percodan, Deroon Comp. and Delenor; that none of these medications appeared to help appreciably; and that he had a chronic back complaint which was incapacitating as far as steady gainful work is concerned.

Dr. Leonard J. Stark, who performed an orthopedic examination on appellant, stated that he was cooperative; that he was wearing a steel spinal brace which extended from the pelvis to his shoulders, and which showed considerable wearing and need of repair; that his cervical spine was tender along the left side from the 3rd to the 7th vertebra; that rotation of the neck toward the right was limited 25% and was painful; that backward bending was associated with low back pain; that there was no question that appellant had a physical disability—giving all the reasons therefor; that he was anxious and worried because of the nature of his disability and the pain he suffered; and that he was totally unable to perform the type of work which he had done previously and, from a practical standpoint, was unemployable.

Dr. Adam Stacy, who examined appellant for the government, reported that appellant's neck was extremely limited in motion to left, right and in all directions; that the movement of his back was limited in all directions with 30% forward flexion; that all of these movements were made with pain; that he had arthritis, old cervical vertebra, thoracic and lumbar vertebrae, severe; and that he was undoubtedly disabled.

Dr. William L. Patterson stated that appellant, after his back injury in 1937 and 1949, had worn a brace since 1952; that his pain was chiefly in the upper lumbar spine; that he was tender over the 10th dorsal vertebral body, and that there was left paravertebral muscle spasm; that he had osteoarthritis between D-11 and D-12, and between L-5 and S-1, and the disc spaces between these different parts of his spine were narrow; that it was "awfully hard" to say that he was not having back pain and that the doctors seriously doubted he would be able to tolerate hard manual work at his age and with the arthritic changes shown on the X-rays.

The evidence was to the effect that in March 1959, appellant had sold all the property that he ever possessed and had used it for living expenses of his family, and that in July 1959 it was about used up, and that thereafter the "welfare" took care of him and his family until he came to Ohio looking for some employment.

Appellant's own testimony, which is substantiated by the physicians' estimate of his pain, may be summed up as follows: During his examination by the Hearing Examiner, appellant became greatly confused about various dates, *concerning which there was no dispute*, and suddenly said: "Will you all excuse me for a minute. You will have to get used to me a minute. I have a pain in the back of my head. I forget just a little bit now. I am in pretty critical shape now."

On further examination by the Hearing Examiner, appellant testified:

"That pill here that I'm—well, I'll say that severe pill—the one that's prescribed by Dr. Beeman's—hit won't totally ease me. It leaves that burning up my spine into the top of my head. Well, it will practically numb me all but that; although it don't settle my nerves. I tremble and I jerk. My muscles jerk practically all the time in my back. I try to buy other things. Try to —cheaper—I guess I take enough of that Stanback in the last five months —well, I average about every two days with these easing tablets. That's the way I'm living. I dread to wake up of a morning. I know the misery what's coming as soon as I raise up."

Appellant further stated: "The pain starts in the lower part of my back, goes up my back into my spine, my head gets numb, my arms also. I can hardly keep from screaming. My legs also get numb, but not as often as my head and arms. At times it feels like a tight band

around my head. I have felt often for my hat to take off, but it wasn't my hat, it was due to my condition."

In another instance the Hearing Examiner put various questions to appellant and received the following answers:

"Q. What else bothers you except this numbness you have? You've described a feeling around your head as if you had a hat on.

A. Well, these vertebraes that has slipped in my back—that pain goes up my spine to the back of my head and then it goes both ways here, right and left, in the back of my head. * * *

Q. You have a spring near your house in which you get your water, don't you?

A. Yes sir, right off below the house.

Q. Do you bring in the water?

A. No sir.

Q. Who carries in the water?

A. My wife. Now and then I get sorry for people that's waitin' on me and me not doin' anything. I'll get the coal bucket. Our coal pile is about ten steps from the door and I'll go out and get a coal bucket of coal. By the time I get in the house with that coal and sit it down, I'm just like that. Well, that pain don't wait for nothin'. It shoots up my spine just every bit of that fast. * * * I'd say it's been doin' that the last year for the worst but I never have been to where I could lift anything to amount to anything since I've been hurt but it's only a gettin' worser all the time. * * * If I lay in the bed, every mornin' this pain in my head wakes me— wakes me up and I want to tell you this. I can't speak as loud as I'm speakin' now when that pain is at its best. I might put it that way. You might say why. The jar of my voice it seems like it opens my head up there with a hard pain."

Appellant also testified that in December 1961 he had taken a job for two hours a day to drive an old truck to take children to school and held the job two months. He gave it up because of his spinal condition, that seemed to go down over his body and made his feet so numb that he could not feel the accelerator; and that the numbness which gets worse day by day started in 1959.

There is nothing in the evidence by the physicians or lay witnesses that in any sense contradicts or implies a contradiction of appellant's testimony as to the pain he suffers and has suffered. Moreover, the Hearing Examiner concedes the pain, but holds that pain must do more than hurt—that it must substantially aggravate his malady. This is completely erroneous, as will hereafter appear.

We have, then, a man who for twelve years has worn a steel brace, 21 inches long, extending along both sides of his back from his pelvis to his shoulders, and who worked during most of that time; whose spinal condition has been described by numerous medical experts as chronic osteoarthritis of the spine, narrowing of intervertebral spaces between the discs of the spine, disc lesion, tenderness along the entire spine, tenderness over the 10th dorsal body, and paravertebral muscle spasm, marked limitation of cervical flexion, and lumbar spinal chronic low back strain, congenital abnormalities of cervical and lumbosacral spine, extreme limitation and painfulness in motion of neck to right left and in all directions severe arthritis of the cervical, thoracic and lumbar vertebrae, large spurs on the bodies of the lumbar vertebrae, indicating presence of degenerative arthritis, in which the major portion of appellant's complaints stems from his injury in 1937, arthritis of the spine, and a ruptured disc; and medical testimony that appellant is completely disabled; disability estimated at 60%, and from a practical standpoint not employable, completely disabled from any hard manual labor; and incapacitated as far as steady gainful work is concerned. Of all of the medical testimony, one physician, Dr. Levitas, after stating that there was tenderness along the entire spine, limitation

of lumbar and cervical flexion, hypoesthesia to pin prick throughout both upper extremities, fusion of four vertebrae, and a transitional vertebra between L–5 and S–1, chronic low back pain and congenital abnormalities of the cervical and lumbosacral spine, gave it as his opinion that appellant had a chronic lumbosacral strain with psychosomatic overlay, which results in a permanent partial disability of 20%. Even to a layman, this appraisal of comparatively slight disability seems entirely superficial, considering the results of the physical examinations by Dr. Levitas, and his medical diagnosis and conclusions, especially when compared with the contradictory testimony of all of the other physicians above mentioned, and when accompanied by the statement that Dr. Levitas considered that, in addition to the spinal condition and pains, there was a "large psychosomatic element present." The psychosomatic element will be considered later. Besides, Dr. Levitas' appraisal of disability may, itself, be appraised in the light of his assumption that appellant had been wearing the steel brace only about a year, when he had been constantly wearing it for approximately ten years.

Moreover, appellant's pain was so severe that his physician stated that none of the pain-killing drugs or sedatives prescribed by him and used by appellant —nine various drugs—were, in the physician's opinion and according to appellant's testimony, of any appreciable help in alleviating appellant's distress and pain.

It is to be emphasized that the findings of the Hearing Examiner are not considered to be supported by substantial evidence when he relies on isolated remarks of one or two medical reports before him. Park v. Celebrezze, 214 F.Supp. 153 (D.C.Ark.), app. dismissed, 321 F.2d 543 (C.A.8). Further, it is error for a Hearing Examiner in a disability benefit case to fail to consider the mass of medical evidence and opinion bearing upon claimant's attitude and psychological condition. Fowler v. Celebrezze, 222 F.Supp. 609 (D.C.N.C.).

This case starts out with a primary reversible error to the disadvantage of a poverty-stricken man suffering from pain incurred during a lifetime of hard labor. The keystone of the decision by the Hearing Examiner, which was adopted by the Secretary of Health, Education and Welfare and which constitutes the basis of the judgment from which appeal is taken, states:

"Granting that the claimant has experienced some pain, the fact that an individual is unable to work without some pain and discomfort does not justify a finding of disability. In Theberge v. U. S., [2 Cir.], 87 F. 2d 697, Judge Learned Hand stated: 'A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities. The only work available to the insured must do more than hurt, it must substantially aggravate his malady.' "

The foregoing is the basis upon which the Hearing Examiner ruled out appellant's pain as disabling.

This court has repeatedly held that it will not follow the holding in Theberge v. United States, 2 Cir., 87 F.2d 697, but that, rather, we follow the holding and notable decision in Butler v. Flemming, 288 F.2d 591, 595 (C.A.5), in which Judge Brown, speaking for the court, said:

"If, as suggested in the Government's brief, Hallard v. Fleming, D.C.W.D.Ark. 1958, 167 F.Supp. 205, and Judge Learned Hand's statements in Theberge v. United States, 2 Cir., 1937, 87 F.2d 697, 698, concerning a different statute enacted for a different policy in a different era, are to stand for the proposition that pain, no matter how severe, is not disabling unless work does 'more than hurt' so that it 'substantially aggravate[s] his malady,' 87 F.2d at page 698, we regard them as contrary to the standard announced in Booker and Kerner and many others like them. Perhaps it is true that

history teaches that 'A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities * * *.' But the purpose of much social security legislation is to ameliorate some of these rigors that life imposes. Congress has in effect stated that if a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he shall be deemed to be disabled for the purposes of this Act."

In Drafts v. Celebrezze, 240 F.Supp. 535, 538 (E.D.S.C.), the court said:

"Pain was brushed aside as a subjective non-entity. Well reasoned opinions and the obvious purposes of the Act compel that great consideration be accorded to that merciless entity called 'pain'. The fact that some extraordinary individuals can bear it and perform unflinchingly does not mean that such heroics is the 'standard'. The criterion is not even the standard of the ordinary man or the average man; the standard is the individual claimant himself, with all his personal assets and liabilities."

If a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he is deemed disabled for purposes of the Social Security Act. Smith v. Celebrezze, 229 F.Supp. 827 (D.C.N.C.). Even pain unaccompanied by any objectively observable symptoms, which is nevertheless real to the sufferer and so intense as to be disabling, will support a claim for disability benefits. Ber v. Celebrezze, 332 F.2d 293 (C.A.2). The fact that there is such a subjective symptom as pain of claimant for social security benefits does not mean that it ranks as a lesser type of disability. Blanscet v. Ribicoff, 201 F.

Supp. 257 (D.C.Ark.). The notion that pain must be endured, that pain, no matter how severe or overpowering, is not disabling unless it will substantially aggravate a condition, is contrary to law under disability provisions of the Social Security Act which were intended to ameliorate some of the rigors that life imposes. Page v. Celebrezze, 311 F.2d 757 (C.A.5). The criteria to be considered in determining a claimant's ability or inability to engage in substantial gainful activity, for purposes of determining his right to social security disability benefits, are objective medical facts, diagnoses, and expert medical opinions on subsidiary questions of fact, subjective evidence of pain and disability testified to by claimant, and claimant's educational background, work history and present age. Helton v. Celebrezze, 200 F.Supp. 759 (W.D.N.C.); affirmed 331 F.2d 342 (C.A.4).

In Lewis v. Flemming, 176 F.Supp. 872–876 (E.D.Ark.W.D.), the court, in reversing the Referee's decision that a claimant was not entitled to disability benefits stated:

"The plaintiff further testified that in July, 1955, while working about his farm his right leg collapsed under him, and that since that time he has been physically unable to do any kind of work; that he is in constant pain; that he has been treated by a number of physicians, and that all they have been able to do for him is to give him some sedation, which affords him some minor and temporary relief from his suffering. * * *

"It is plain from the Referee's opinion that he did not disbelieve the plaintiff or consider that he was malingerer. On the contrary, the Referee stated that he was 'impressed with the sincere testimony of the claimant and he has no reason to doubt any of the material facts to which the claimant testified'. * *

"There is nothing in the report of Dr. Padberg or in the letter from the Medical Center which contra-

dicts the testimony of the plaintiff or the reports of the other physicians who have been mentioned. Such being the case, the Court is persuaded that the only logical and reasonable inference that can be drawn from the record is that the plaintiff on account of his arthritis and pain incident thereto can no longer work, and that in view of his age, his limited education, and lack of specialized skill, this inability precludes him from engaging in any substantial gainful activity. * * *

"[T]he Referee did not question the fact that the plaintiff is afflicted with osteoarthritis and did not question the plaintiff's allegations of pain, which are supported not only by his own testimony but also by the medical evidence in the file. He apparently drew a distinction between the arthritis itself, that is to say the bony spurs growing on the plaintiff's spine, and the pain which is the concomitant of those spurs; and he then went on to hold that pain itself is not a 'medically determinable' disability within the meaning of the statute. The Court does not consider the distinction valid, nor can the Court agree with the Referee that a disability due in substantial part to pain may not entitle a claimant to the benefits of the Act.

"There is nothing in the statute or the legislative history which indicates a Congressional intent to exclude disability caused by pain, as contrasted to other types of disability, such as disability resulting from loss of limbs or sight or from mechanical disfunction of the limbs, joints, or other organs of the body. As a matter of fact, common experience and observation teach that in many cases of disability pain in one form or another is the chief and immediate disabling agent. An individual's body may be mechanically capable of use and function, but the pain resulting therefrom may be so great as to preclude them. Indeed,

the nervous system in an effort to avoid agonizing pain may in effect impose immobility and inactivity upon the person affected; and in such a case the disability is no less real than it would be if the patient had lost the mechanical use of his body."

As a further disabling factor, there is a large psychosomatic element affecting appellant's condition.

Dr. Levitas stated, after an orthopedic examination of appellant, that he had a chronic lumbosacral strain *with psychosomatic overlay*, and that his history and subjective responses led Dr. Levitas to feel that there is a large psychosomatic element to his complaints. Dr. Baird, after appraising appellant's injuries as a ruptured intravertebral disc and arthritis of the spine, found that he was *extremely psychoneurotic* and cerebrally deficient, and that such deficiency would prevent him from performing gainful employment. Dr. Beeman, who had prescribed all the pain-killing drugs for appellant who had used them without any appreciable alleviation of his pain, said, after examining appellant, that he felt there was a fair degree of anxiety present and a psychosomatic element associated with appellant's complaints; and that appellant should have the benefit of consultation with a neurologist, an orthopedic surgeon and, perhaps, a psychiatrist. There is no doubt about the large psychosomatic element affecting appellant's condition, as well as the degenerative state of his spine. *The Hearing Examiner, himself, found that "it is apparent that claimant suffers from some spinal ailment which is caused in part by degenerative osteoarthritis. This is superimposed upon a congenital abnormality and perhaps aggravated by trauma. This condition is further complicated by a psychosomatic overlay."*

Although this "psychosomatic element" is mentioned in the Hearing Examiner's Determination, nothing in the record informs us of what this consists, or that the Hearing Examiner paid any attention to it more than merely to mention it. It is a factor which is consider-

ed very important by nearly all of the physicians whose evidence was considered in the case, but we are not told by the Hearing Examiner how this factor affects appellant, although, obviously, it has an important effect upon him. Under these circumstances, it appears proper to make a few observations on the meaning of the "psychosomatic element" present in appellant's condition, and these observations are taken from standard authorities on the subject.

Studies in psychosomatic medicine, as hereafter appears, disclose that emotions can cause transitory or chronic disturbances of physiological functions, and this fact is sustained by the courts. In this case, Dr. Beeman, after examining appellant, recommended that he should have the benefit of consultation with a neurologist and, perhaps, a psychiatrist because of the degree of anxiety present. Dr. Baird stated that appellant was extremely psychosomatic. Other physicians gave it as their opinion that there was a large psychosomatic element affecting appellant's condition. In "Mental Abnormality and Crime" published as one of the English Studies in Criminal Science, by the Department of Criminal Science, Faculty of Law, University of Cambridge (MacMillan and Co., Ltd., London, 1944), Dr. D. R. MacCalman, M.D., Lecturer in Psychopathology at Aberdeen University, at p. 129, states:

> "*We must first distinguish from the normal anxiety which the average workman feels after injury and an anxiety neurosis proper.* Anxiety of the normal type is bound to occur in a disabled workman, for his most precious possession, his health, has been threatened, perhaps permanently, and this constitutes, to himself and his family, a threat which is very real. The reduction in pay from his normal wage to thirty shillings weekly, which is the maximum disablement allowance made under the Act, means using up his savings

or semi-starvation for his household. Even this meagre allowance may be further reduced when he is certified fit for 'light work'. He tries to get work, but who will employ him in his disabled or semi-disabled condition? He becomes tense, irritable, sleepless, or, if he loses hope, listless, soured and indifferent. Such a state is unfortunately only too common; it is painful and serious, but it is not an anxiety neurosis. It is caused by an obvious and very real environmental threat to security; it would never occur if injured workmen were relieved of material anxiety, if they got proper rehabilitation treatment and were assured of employment in the future.

> "Now, because this normal type of anxiety can be relieved by suitable work and economic security, a regrettable fallacy has crept into the attitude of doctors and lawyers towards neurosis cases. They see that the patient suffers from anxiety, mistake it for normal worry over his position, and think that he will be cured by work. This not only implies that a neurosis is something akin to laziness, or at least faint reluctance 'to do an honest day's work', but confuses the condition with a consciously determined attitude of mind. Even patients themselves have been fooled into believing that work would cure them. *Nothing is further from the truth. A neurosis can be cured only by psychotherapy* * * *."

A psychosomatic overlay does not mean some imaginary complaint. "What the systematic psychosomatic studies have shown is that not only transitory physiological changes can be caused by emotions, but that sustained emotional strain may lead to chronic disturbances of physiological functions and in this way cause bodily diseases."[2] "Arthritis, for example, may be the reaction to a simple

---

2. Studies in Psychosomatic Medicine, Roland Press, New York, 1948, p. 27, quoting from "Modern Attitudes in Psychiatry", by Franz Alexander, M.D., Columbia University Press, New York, 1946, pp. 61, 89.

emotional disturbance. It may mark a deeply varied emotional disturbance. It may have created such tissue damage that it is called organic. In all three cases the joints may be equally swollen, the pain equally intense." [3]

"Is there any indication of what causes the plaintiff's pain? Is the pain organically caused or emotionally caused, or is it an admixture of both? * * * It is the expression of experts that emotional pain can be as disabling as organic pain, when the one who suffers it feels it as if it were real pain. In such a case, disability would result and could disable such a person from substantial gainful employment within the meaning of the Social Security Act.

"In this day of scientific and medical achievement, there are numerous medical experts in the field who may examine and test a complaining person objectively and determine with reasonable accuracy the reality and genuineness of a person's subjective complaints, and as well, if any pain exists its character and extent. Although as between organic and emotional pain, certain instances may not be tested to determine which may be causing the pain, nevertheless, the pain in both may be as real and as disabling." Lightcap v. Celebrezze, D.C., 214 F. Supp. 209, 215, 216.

We have, then, the finding of the Hearing Examiner that appellant suffered pain, caused organically as well as pain caused emotionally—"from some spinal ailment * * * caused in part by degenerative osteoarthritis * * * superimposed upon a congenital abnormality and perhaps aggravated by trauma * * * and is further complicated by a psychosomatic overlay." Yet, because the pain does not do more than hurt, the Hearing Examiner finds such pain is not disabling because it does not substantially aggravate appellant's malady. This, as we have shown, is clearly erroneous.

In addition to his erroneous views and conclusions on the disabling entity of pain, the Hearing Examiner proceeded to rule repeatedly contrary to the decisions in disability cases rendered by this court and other leading adjudications by federal courts on this subject. He held that the medical evidence did not indicate that appellant's impairments had become so severe that he was unable to engage in substantial gainful activity of a non-strenuous nature, and that there was no reason why his physical impairments would prevent him from engaging in lighter types of unskilled labor. This conclusion is entirely unjustified by the evidence.

"[T]he Referee gave inadequate consideration to the possibility of severe orthopedic trouble. This is a physical defect that is notorious in medical circles for difficulty of clinical proof. There are objective findings in this record pointing to a severe back ailment. This is confirmed by a repeated finding of a possible disc condition in the back. The Referee gave inadequate consideration to the tie-in between these objective findings and the subjective evidence of severe radiating pains in the back and inability to withstand slight exertion because of them. * * *

"We think that it is possible to make a finding of nondisability on the basis of this record only if one adopts a highly technical and literal interpretation of the Act. We believe that on the entire record, on the basis of the objective medical evidence, and of the substantial body of subjective evidence of incapacity, which is largely uncontradicted, and of the evidence of Claimant's work history, educational background, and age, the District Court was not in error in finding that this Claimant

3. Mind and Body: Psychosomatic Medicine by Flanders Dunbar, M.D., Random House, New York, 1955, p. 244.

was precluded by reason of his physical condition from holding any substantial, gainful employment." Underwood v. Ribicoff, 298 F.2d 850, 851, 854 (C.A.4).

When a claimant comes forth with evidence of serious physical impairment, the record must contain evidence on which the denial of the claim may be based; and where there is uncontroverted medical testimony that the applicant is unable to engage in any substantial gainful activity, it is the duty of the Secretary of Health, Education, and Welfare to award him the relief requested, assuming that all other qualifications are met. Davis v. Celebrezze, 213 F.Supp. 477 (D.C.Tex.); Williams v. Celebrezze, 228 F.Supp. 627 (D.C.Ky.); Jarvis v. Ribicoff, 312 F.2d 707 (C.A.6).

The record gives no appreciable support to a finding that appellant was able to engage in a substantial gainful activity. Quite the contrary, it gives overwhelming support to a finding that appellant could not do hard or moderate manual labor, and, indeed, that he could not maintain even slight exertion for any length of time.

Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It has been held that the finding of a Hearing Examiner that a 62-year-old claimant, who had only three years of schooling, could write only his name but could not read, and who had fingers that were arthritic, with swollen joints and limited movement, was able to engage in substantial gainful activity, was not supported by substantial evidence. Music v. Ribicoff, 195 F.Supp. 907 (D.C.Ky.). See also Cummins v. Celebrezze, 222 F.Supp. 285 (D.C.Ark.). In Leath v. Flemming, 191 F.Supp. 577 (D.C.Ala.), the court held that the determination of the Secretary that a claimant who suffered from arthritis so severely that he could not remain standing or sitting for long, could walk only short periods of time, and could drive only very short distances, was not so disabled as to preclude him from performing gainful activity, was not supported by substantial evidence. "Although a few of the doctors who examined Plaintiff did not make a specific finding of disability on the part of the plaintiff to perform manual labor, a summary of all of the medical evidence can lead to the only conclusion that Plaintiff is not able to engage in substantial gainful employment." Davis v. Celebrezze, 213 F.Supp. 477, 478 (D.C.Tex.).

Where a Hearing Examiner has received expert opinions on the issue of a claimant's ability to work and they are not repudiated in any respect by substantial evidence, an adverse decision should be set aside as based on suspicion and speculation. Hilber v. Ribicoff, 196 F.Supp. 460 (D.C.Mont.).

A court is not bound to sustain the denial of disability benefits where a claimant has raised serious questions and the evidence affords no sufficient basis for the negative answer of the Secretary of Health, Education and Welfare; and where the opinion of a medical expert that claimant is totally disabled is not controverted by substantial evidence, an administrative determination that the claimant is not disabled will be reversed.

The Secretary's holding that appellant was not disabled for substantial gainful employment appears to depend upon Dr. Levitas' statement that he had a permanent partial disability of 20%. This statement appears contradicted by the other findings of Dr. Levitas who saw appellant only on two different occasions for examination. But appellant's family physician, Dr. Stacy, said he was undoubtedly disabled. Dr. Stark said he was totally unable to perform the work which he had previously done, was 60% disabled and, from a practical standpoint, unemployable. Dr. Beeman said he was incapacitated as far as steady gainful work was concerned. Dr. Baird said he was totally and permanently disabled from any kind of gainful employment. The Hearing Examiner's findings are not supported by substantial evidence when

he relies on an isolated remark in a medical report before him. Park v. Celebrezze, supra. Substantial evidence does not sustain a Hearing Examiner's decision when it is based almost exclusively on a medical report of a physician making a single examination of a claimant, when two doctors who treated him over a period of years stated that he was totally incapacitated. Sebby v. Flemming, 183 F.Supp. 450 (D.C.Ark.). "The medical evidence that Cyrus suffers from a disability is uncontradicted. The only conflict is as to the extent of his residual capacity. Normally, it is for the Secretary and not the courts to resolve conflicts in the evidence. * * * But where the Secretary places reliance upon one portion of the testimony to the disregard of overwhelming evidence to the contrary, the Secretary's conclusion may not stand." Cyrus v. Celebrezze, 341 F.2d 192 (C.A.4).

With regard to appellant's employment with the Keidel Supply Co., Inc. from September 9, 1959, to March 8, 1960, his eyesight was so deteriorated that in carrying out a light job of sweeping and dusting, he could not see whether or not he had removed the dust from the floors or various machines. He, himself, testified to his bad eyesight. Dr. Dienger, in an ophthalmological examination, performed at the request of the Secretary, said that he had examined appellant, who had a history of decreasing vision since 1949; that he had had an accident resulting in a scar on the cornea; and that he also suffered from a degeneration due to injury to the inside of the eye, as well as inflammation of the layers about the retina. Mr. Keidel finally told appellant that he just could not use him, stating: "You can't lift; you can't see how to sweep the floor." If appellant's spinal condition disabled him from heavy work, that condition, coupled with his lack of eyesight, disabled him from any so-called light employment that the Social Security Administration could conjure up. It is obvious that, as Mr. Keidel stated, "appellant was kept on out of sympathy. * * * His work was terminated under mutual consent. He couldn't do the job and we parted company on a friendly basis."

"*Intermittent, sporadic or infrequent activity does not constitute ability to 'engage in substantial, gainful activity' precluding establishment of disability* under Social Security Act; the quoted phrase means performance of substantial service with reasonable regularity in some competitive employment, and does not mean total, absolute, complete full-time activity for hire or compensation but means a significant quantity of fairly constant physical, mental or mixed physical and mental service productive of value or benefit." Lightcap v. Celebrezze, 214 F.Supp. 209 (D.C.Pa.) (Emphasis supplied.)

"The hearing examiner apparently failed to give sufficient consideration to the manner and degree in which the plaintiff's various impairments affect him as an individual in his desire to secure employment which could be characterized as substantial gainful activity. There is no doubt that the plaintiff manifests a sincere desire to secure employment. *The letters from the Social Security Administration indicate that he sought their assistance in his search for employment.*

"The hearing examiner concludes that the plaintiff failed to establish an impairment of such severity as would preclude him from engaging in some type of substantial gainful activity, yet the record affirmatively establishes that the plaintiff is physically and mentally and emotionally incapable of any substantial gainful employment." King v. Celebrezze, 223 F.Supp. 457, 465 (D.C.W.D. Ark.) (Emphasis supplied.)

"It further appears from the record of the hearings and from the referee's subsequent decision that undue weight was placed upon the few sales made by plaintiff under his special license. In view of the

very limited commercial activity of plaintiff after his affliction, a determination with respect to such activity consistent with a finding of permanent and total disability may very well have been made. *An understanding of human nature reveals that a person may attempt such sporadic and limited work not because of his ability to work but because of his unwillingness to live a life of idleness even though he be totally and permanently disabled within the meaning of Section 216 (i).* See Berry v. United States, 1941, 312 U.S. 450, 455–456, 61 S.Ct. 637, 85 L.Ed. 945." Jacobson v. Folsom, 158 F.Supp. 281, 285, 286. (S.D.N.Y.) (Emphasis supplied.)

Under the circumstances above outlined, the employment of appellant by Mr. Keidel cannot be considered "substantial gainful activity" as, admittedly, he could not do the work and, although he received weekly payments, it was only, as his employer said, on account of sympathy for him.

The above effectively disposes of the Secretary's contention that appellant demonstrated an ability to engage in substantial gainful activity during the time he was employed by Mr. Keidel from September 9, 1959, to March 8, 1960, and that he, accordingly, failed to establish the presence of the required disabilities on or before September 30, 1958, the date when appellant last met the special earnings requirement of the Social Security Act. It should be mentioned that the Hearing Examiner, on the first hearing, found that appellant had met the special earnings requirement on the date of his injury in June 1958, which is in accord with appellant's claim at that time and at the present time.

Appellant actually filed his application for disability benefits on June 19, 1959, *claiming that he became disabled in June 1958* because of a "slipped disc of lower back bad eyesight arthritis—legs and shoulders", and on July 13, 1959, he further filed an application to establish disability, setting forth the same disabilities

as in his June 1958 application, and adding that he "can't stay on feet. Very painful to work move or do anything." He further stated that his last medical examination had been made by Dr. Charles Stacy *in July 1958.*

On July 29, 1959, Dr. Charles Stacy rendered a medical report in which he stated that *appellant's injury occurred in July 1958, and he became unable to work at that time.* Practically all of the medical evidence tends to substantiate appellant's contention as to the time of his injury; and, *on August 22, 1958,* Dr. Stacy further reported that he had treated appellant "for a period of time," and *on June 15, 1958,* another X-ray had been taken, showing hypertrophic spurring sacralization of lumbar vertebrae and that, undoubtedly, appellant was disabled. All of the foregoing is proof of the fact that appellant was suffering from medically determinable impairments of such severity as to preclude all performance of any substantial gainful activity from June 1958 forward, and that such impairments were still present at the time of his application in June 1958—contrary to the Hearing Appeals' unsubstantiated finding that because of appellant's employment with Keidel, he showed an ability to engage in substantial gainful activity subsequent to the date of expiration of his special insured status on September 30, 1958.

There was no substantial evidence of what appellant could do or what employment opportunities there were for a man who could do only what he could do.

"The Hearing Examiner made no findings on the issues as to what the plaintiff can do or what employment opportunities are available to a person afflicted as he was, and no evidence to sustain such findings was presented by the defendant. The rule is now thoroughly established by the Court of Appeals of this circuit that without such findings the decision of the Secretary cannot be supported. King v. Flemming, 6 Cir., 289 F.2d 808; Roberson v. Ribicoff, 6 Cir., 299 F.2d 761;

Holbrook v. Ribicoff, 6 Cir., 305 F.2d 933; Jarvis v. Ribicoff [312 F.2d 707 (C.A.6)]; Hall v. Celebrezze, 6 Cir., 314 F.2d 686; Jones v. Celebrezze, 6 Cir., 321 F.2d 192." See Ratliff v. Celebrezze, 338 F.2d 978.

In Butler v. Flemming, 288 F.2d 591 (C.A.5), the court stated that the record in that case failed to disclose that there was any indication of any specific work less exacting within claimant's residual capacity and reasonably available as a prospective source of employment *in the general area* where he lives, and that this was the test as to whether there was any work available which the claimant was able to perform. See to the same effect Massey v. Celebrezze, 345 F.2d 146 (C.A.6).

There was the evidence of the "Vocational Counselor," who has become a stock figure in these cases, and who, as usual, availed himself of the U. S. Dictionary of Occupational Titles to point out what work was available, but his testimony was no more impressive than that of the Vocational Counselors in Massey v. Celebrezze, supra, and Cyrus v. Celebrezze, 341 F.2d 192 (C.A.4); and his evidence carried no weight. As an instance, the Vocational Counselor felt that among the types of light work which appellant could perform was that of a night watchman—a rather peculiar occupation for a man whose eyesight was so poor he could not hold down a job of sweeping or dusting machines because he could not see whether or not the dust was removed. Moreover, the Vocational Counselor thought appellant could do the work of a flagman, except for prolonged standing. When asked by appellant's counsel whether it would affect appellant's abilities to perform such jobs, while he was taking the heavy dosages of drugs and sedatives, already referred to, the Vocational Counselor's answer was that "for some employers, this would make a difference, I suspect, for others I doubt that it would however." Other jobs which the Vocational Counselor suggested for appellant were equally absurd—armature winding, tool grinding, assembling and repair of electrical equipment, spray painting, "a kind of bench work in some industries," machine tending, "the kind of thing where the worker, the employee, trouble shoots the machine, *keeps an eye on it* to see that everything is running properly." (Emphasis supplied.)

No one, however, contended that appellant could do the light job of sweeping and dusting, from which he had been discharged by the Keidel Company because of his physical disabilities and his failure to see what he was doing, although both appellant and the Keidel Company wanted him to continue if he could do the work, and the Hearing Examiner impliedly admits this.

The Hearing Examiner found:

"In view of claimant's demonstrated residual abilities and continuing activities, as well as the testimony of Dr. Auvenshine, an expert vocational witness, the Hearing Examiner finds that there are many types of employment in which claimant could engage, and that such employment is found generally in the economy of small towns and rural areas such as the one in which claimant lives. Such jobs as watchman, machine tending, and bench work, including sorting and packaging manufactured small articles, as well as assembling appliances, armature winding, tool grinding, assembling and repair of electrical equipment, spray painting, etc., are well within claimant's residual capabilities, some of them require a minimal amount of training and others require none, and they are all light, non-strenuous work entailing a minimum of prolonged standing, walking, or stooping."

There is no substantial evidence that appellant could perform any of the jobs mentioned by the Hearing Examiner. Appellant has no demonstrated residual abilities. The evidence of Dr. Auvenshine, as we have shown, is without any weight whatever, as bearing upon the work appellant can do. There must be evidence to show the reasonable avail-

ability of jobs which this claimant is capable of performing in the general area where he lives. There was no such evidence.

It is to be remembered that appellant, coming from a mountain village in Kentucky, worked in that state as a boy and as a young man; then went to Tennessee seeking and finding work; and afterward to Kansas, where he also secured employment. Subsequently, he sought employment in Ohio, which he found, but could not continue because of his disabilities. He afterward went to the Rehabilitation Center and the Good Will Industries in Ohio for employment. They stated that appellant would have been willing to work if they could have done anything for him but they were unable to find any employment. They said he was interested in getting some kind of work; and the Rehabilitation Center told him that they had no job open but would keep him in mind; but he never heard from them again.

"Where a claimant * * * has failed to make an effort to obtain employment, it seems obvious that a finding of non-disability can be supported on less evidence than where a claimant has attempted unsuccessfully to obtain employment, or, having found employment, has been unable to carry it through." Sanders v. Celebrezze, 225 F.Supp. 836, 842 (D.C.Minn.).

"The findings and conclusions of the Examiner simply are not supported by substantial evidence. Any lingering doubt to the contrary is quickly eradicated by the statement of an officer of the Employment Security Commission of North Carolina, a public employment agency, that 'it is impossible for our office to find Miss Wells any work.'

" 'If there is no market for the service [the claimant] is able to render, then he is truly disabled within the meaning of the statute.' Ferran v. Flemming, 293 F.2d 568, 571 (5th Cir. 1961)." Wells v. Celebrezze,

209 F.Supp. 444, 447 (D.C.W.D. N.C.).

In Lightcap v. Celebrezze, 214 F.Supp. 209 (D.C.W.C.Pa.), the court, in considering a claim for disability benefits under the Social Security Act, and reviewing the action of the Secretary to ascertain whether there is any substantial evidence to support it, said:

" 'In discharging that duty we record in this case, the Court is mindful of what Judge Kalodner of the Third Circuit in Goldman, Administrator of the Estate of Goldman v. B. Folsom, 246 F.2d 776, 778, 1957, said:

" 'In discharging that duty we must keep in mind, as adjured by the Supreme Court, that "courts must now assume more responsibility for the reasonableness and fairness" of decisions of federal agencies "than some courts have shown in the past" and "Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function." Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474 [475], 490, 71 S.Ct. 456, 466, 95 L.Ed. 456.' "

The proof of Mr. Miracle's disability is substantiated by the great mass of the evidence, and evidence to the contrary is lacking in substance.

■ The review of cases for disability benefits under the Social Security Act is onerous from many aspects. The case before the Hearing Examiner is heard informally. This means that there is practically no examination or cross-examination of any witnesses, except the claimant himself, usually a man whose life has been one of hard labor, and with little education; and, sometimes, a Vocational Counselor. The record, for the most part, consists of letters and written statements regarding the disability claimed, the extent of it, or the lack of it. Many of these statements consist of official printed forms of applications and

reports filled in, in the handwriting of various individuals; and their reproduction in the record often requires laborious decipherment. These records call for searching investigation by the district courts, and further searching investigation by appellate courts.

In Scott v. Celebrezze, 241 F.Supp. 733, 736, (S.D.N.Y.), Judge Feinberg emphasized how searching must be the review by the courts of the action of the Secretary, and mentioned that in the cases reported in volumes 227–236 of Federal Supplement, the Secretary's decision was upheld only 27 times, but reversed or remanded 47 times; and in this court, during the past five years, the Secretary's decision was upheld 5 times and reversed 12 times, which again shows how careful and searching must be the review.

Because of the errors heretofore pointed out, and because the findings of fact and conclusions are not supported by substantial evidence, the judgment is reversed and the case is remanded to the Secretary of Health, Education and Welfare with directions that appellant be granted a period of disability and disability benefits in accordance with the Social Security Act.