**John J. KING, Plaintiff,**

**v.**

**Robert H. FINCH, Secretary of Health, Education, and Welfare, Defendant.**

**Civ. A. No. C 69–426.**

United States District Court,
N. D. Ohio, E. D.

April 15, 1970.

James R. Thomas, New Philadelphia, Ohio, for plaintiff.

Robert B. Krupansky, U. S. Atty., Harry E. Pickering, Asst. U. S. Atty., for defendant.

## MEMORANDUM

WILLIAM K. THOMAS, District Judge.

Under Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (1969), plaintiff John J. King appeals from the denial of his application for disability insurance benefits under the Social Security Act. Plaintiff's application, filed on May 6, 1968, had been denied by the Director of the Division of Evaluation and Authorization on initial consideration and by the Director of the Division of Reconsideration a short time thereafter. A hearing was held on February 10, 1969 and an adverse decision was rendered by the hearing examiner on February 26, 1969. Shortly thereafter the Appeals Council of the Social Security Administration notified the plaintiff that it considered the decision of the hearing examiner correct and declined to take further administrative action. The matter is thus properly brought before this court.

Plaintiff, a 55-year-old male with a fifth grade education, had been employed as a transferman by Evans Brick Company, a producer of bricks, from 1955 until November 11, 1965. In that position plaintiff's duties required laborious physical exertion but neither demanded nor developed any special occupational skills. Prior to his work in the brick factory plaintiff had worked eight or nine years for Dindo Coal Company in a job requiring the lifting, carrying, and positioning of explosives. As to the earlier work experience of plaintiff the transcript of the hearing contains only the following information:

Q Did you serve in the military service?

A No.

Q Have you any kind of specialized training?

A No. The only training I had was at the coal mines.

A medical examiner wrote in a letter concerning plaintiff:

Quit school in 5th grade to work on farms and then in coal mines up to 1955 * * *.

Plaintiff has been blind in one eye since age 11.

The hearing examiner determined that the plaintiff was not disabled within the statutory meaning of Section 223(d) (1) and (2) (A), 42 U.S.C. § 423(d) (1) and (2) (A). This is apparent from his conclusion that:

At no time during the effective period of claimant's application, pursuant to the 1965 amendments to the Social Security Act, did or does the claimant have physical or mental impairments, either singularly or in combination of such severity or longevity as to preclude the claimant from engaging in any substantial gainful activity.

The conclusion is based on the following evaluation of the evidence:

The medical evidence reveals that claimant, an obese, well developed and well nourished male, presented essentially negative medical findings except for flat feet, overweight, and minimal tenderness under the calcaneus, with a sequelae of bilateral internal tibial torsion. The medical evidence further establishes that although claimant cannot be expected to stand for long periods of time because of the condition of his feet, there are no other body

limitations except for the loss of the sight of his left eye at eleven years of age. This man, who is apparently healthy except for foot discomfort on standing, is, according to the testimony of Vocational Expert Jenkins, capable of performing in the work of kitchen helper, and packer of plastics, which jobs both exist in significant numbers in the national economy as well as in the claimant's vicinity of residence. [footnote omitted]

This court must review the record to determine whether the hearing examiner's decision is supported by substantial evidence. Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (1969). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Miracle v. Celebrezze, 351 F.2d 361, 378 (6th Cir. 1965).

This court has carefully reviewed the hearing examiner's decision, the transcript of the hearing, medical records contained in the file, and all other records therein. Plaintiff's claim is straight forward and uncomplicated.

In his application for disability insurance benefits plaintiff described his disability simply as "heel condition." When asked by the hearing examiner why he had left his job as a transferman in a brick factory, plaintiff answered:

My feet couldn't stand [it]—I couldn't walk any more.

There followed this exchange:

Q You mean you had pain in your feet?

A Yes. I had pain. And in the mornings I had to put them in a tub of water.

Q So you had pain in your feet, all day long, and every day?

A That's right.

Q And that prevented you from continuing with your job?

A Yes, I couldn't stand on that cement.

When asked why he was not working at the time of the hearing, the plaintiff answered: "Well, I can't stand up too long, that's why." Plaintiff states that the difficulty with his feet has caused, and is causing, insomnia. He testified:

Some days I go for two days, and I can hardly sleep * * *.

\* \* \* \* \* \*

I get up at night and get a tub of cold water and put my feet in it to cool them off.

Plaintiff further testified that his feet began to trouble him when he worked in the coal mine. He stated:

I just couldn't find a place to rest them hardly. So then I quit there and I went to the brick plant.

Because of the condition of his feet plaintiff found it necessary to stop working at the brick plant on November 11, 1965. A medical report of E. J. Casiano, M.D., indicates that plaintiff told Dr. Casiano that for two months prior to November 22, 1965, he had experienced pain in his heels, on walking. A letter from C. S. Sandhu, M.D., indicates that plaintiff told Dr. Sandhu that the problems with his feet were first experienced in 1964 and kept getting worse. A report of a disability interview conducted by Ala J. Smith for the Social Security Administration on March 21, 1967, states that "around 1963 W/E noticed he [sic] feet bothering him."

Medical evidence is rather limited. Dr. Casiano, an orthopedic surgeon, filed a report on April 6, 1967. In it he relates that plaintiff first came to him on November 22, 1965. Dr. Casiano found that the left foot revealed tenderness in the heel, sole and calcaneus, and the right foot revealed tenderness in the calcaneus on the inferior border. "Feet—low arches" were also noted. Plaintiff returned to the doctor six times within the next three months, regularly reporting pain in his heels and other areas of his left foot. The doctor ordered x-rays, a uric acid test, and a fasting blood test. None of the tests revealed

any medical abnormality with the exception of "moderate pes planus deformity." A number of treatments were attempted without marked improvement. Dr. Casiano's report of a visit in February 1966 states:

The last time I saw the patient was on 2/15/66. On this call he states that he is improving slowly. He complains of pain in the metatarsal heads of the left foot. He states that he has not worn the metatarsal bar. There is no tenderness under heel on palpation. I recommended that patient add the metatarsal bar to the left shoe; Continue with the contrast baths. He was to return in three weeks. He may return to work on 3/7/66. He has not worked since 11/11/65.

Dr. Casiano next notes:

Patient failed to keep appointment. Has never returned to office since 2/15/66.

Dr. Casiano's only medical diagnosis was "bursa under left calcaneus."

On July 9, 1968, the government sponsored another medical examination by the same doctor. In a report resulting from that examination, Dr. Casiano stated:

[T]he patient was treated by me in 1965 and 1966, with a cast to the left leg and injections of Hydrocortone to the left foot. The patient felt no improvement.

*　*　*　*　*　*

Examination of the right and the left foot, revealed minimal tenderness under the calcaneus. The ankles have 90 to 140 degrees of plantar flexion. The anterior tibial pulse is present, bilaterally. Examination of inferior extremities, revealed a sequelae of bilateral internal tibial torsion.

Neurological examination revealed the ankle jerks and the knee jerks to be present and active, toe extensors, strong, and there was diminished superficial sensation on the inner aspect of the right lower leg. The leg-length is equal. The straight-leg raising test was negative, bilaterally. Patient has difficulty on sitting up from a laying-down position.

My impressions: 1. Flat feet. 2. Overweight.

My recommendations: X-ray of the left heel bone, two views. X-rays of the os calcis, taken at Union Hospital, on July 9, 1968, revealed: There are no fractures, dislocations, or spurs. The joints appear normal.

I feel that this patient could do a sedentary type of job, that will not require him to be standing for long periods of time.

A report is provided by Alfonso Aceituno, M.D., a general practitioner, dated April 5, 1967. In it he describes an examination made on September 12, 1966, plaintiff's first visit to him.

The physical examination was essentially negative except for the lower extremities.

Extremities: Examination of the extremities revealed slight cyanosis, redness, and an increase in temperature. The oscillometry in the foot was 10–16. The patient was given some aspirin with phenobarbital which gave him relief and he did not come back until a short time ago. At this time I suggested that he go to the Ohio State University Hospital for a complete study of his vascular system, and investigation of this condition. An appointment has been made for him at the General Surgery Clinic on April 13, 1967.

*　*　*　*　*　*

Diagnoses: 1. Erythermalgia—Etiology Unknown

2. Questionable Arthritis

3. Questionable Peripheral Neuritis

A report from the Surgical Clinic, University Hospital, is dated April 27, 1967. No arterial or venous problems were found. Pulses were noted as good. Position sense and sensation to light touch was "OK." Patient was found to have flat feet and to be very obese. The

examiner thought the problem "[m]ay be peripheral neuritis" and suggested that the applicant lose weight.

The only additional medical evidence is a letter to the Disability Determination Section of the Bureau of Vocational Rehabilitation, Columbus, Ohio, from Dr. C. S. Sandhu, a neuropsychiatrist. After describing the examination, Dr. Sandhu presented his diagnosis and recommendation:

*Diagnosis:*

1. Passive-aggressive Personality with dependency needs.
2. No localizing neurological findings.
3. Blindness of left eye due to traumatic amblyopia, and traumatic cataract.
4. Exogeneous obesity, with pes planus, which is a triggering factor to his complaints, as there is no impairment of *cutaneous and proprioceptive vibratory and position sensation.*

*Recommendation:*

Orthopedic Consultation

The condition does not prevent him from managing benefit payments in his own interests if found eligible for benefits.

As reviewed thus far plaintiff's description of his difficulties and the medical evidence permit a finding that plaintiff suffers from an unexplained ailment causing pain and a burning sensation to his feet and consequential loss of sleep. Plaintiff's testimony and Dr. Casiano's report reveal that medical science has been able to provide no more than temporarily successful treatment. It is clear that plaintiff is, and has been for several years, unable to continue employment in work requiring substantial physical exertion while on his feet.

However, by itself this is not enough to qualify him for disability insurance benefits because applicant must be unable to "engage in any * * * kind of substantial gainful work which exists in the national economy * * *."

Plaintiff's counsel argues, however, that plaintiff by proving his inability to perform his usual occupation has satisfied his burden of proof. This court has recently discussed the burden placed on an applicant for disability insurance benefits:

In qualifying for benefits a claimant must be able to fit himself within the statutorily defined category, and the claimant has the initial burden of so doing. Specifically, the claimant must prove that he is or was for a period of one year unable to work at his usual occupation. If the claimant is unsuccessful in proving this, he will fail to recover benefits. If the claimant, however, can establish inability to perform his usual occupation, the burden shifts to the Secretary. May v. Gardner, 362 F.2d 616 (6th Cir. 1966). The Secretary must then adduce evidence showing that the claimant is able to engage in some other kind of substantial gainful activity which, under the recent amendments to Section 223(d) (2) (A) of the Social Security Act, 42 U.S.C. § 423(d) (2) (A) (1969), exists in the national economy. Patterson v. Finch, 313 F.Supp. 1121, January 19, 1970.

At the hearing in this case the Government presented Kenneth J. Jenkins, a Ph.D. in counseling psychology and Director, Testing and Counseling Center, Cleveland State University. Dr. Jenkins had read the medical evidence contained in the record before this court and was present at the hearing examination. Dr. Jenkins testified that it was his professional opinion that a man of plaintiff's age, educational training, work experience, and physical condition could perform the job of kitchen helper or plastic packer. He reached this conclusion on the grounds that both jobs could be performed, in the main, while seated.

This testimony is uncontradicted. Nor did any medical examiner present any evidence compelling a contrary con-

clusion. Dr. Casiano, on February 15, 1966, concluded "[h]e may return to work on 3/7/66." After a government-financed examination on July 9, 1968, Dr. Casiano altered that opinion, but stated: "I feel that this patient could do a sedentary type of job, that will not require him to be standing for long periods of time." Dr. Casiano's diagnoses and impressions, bursa under left calcaneus, flat feet, and obesity, fail to contradict but instead reinforce Dr. Jenkins' opinion. No other medical testimony compels or even suggests a conflicting conclusion.

Nor does plaintiff's testimony at the hearing examination contradict Dr. Jenkins' conclusion. Although inconclusive it is of inferential value that plaintiff testified that he is able to take care of all his personal needs for health and cleanliness; he cooks meals, he drives his car into town and picks up groceries. When asked whether he was in pain during the hearing examination this exchange took place:

Q [by hearing examiner] Are you in any pain or discomfort now?

A Well, my legs ain't comfortable. I'll tell you that.

Q Well, that doesn't tell me enough. Are you in any pain now?

A A little, yes.

Q What do you mean by a little?

A Well, if I set around and ride too far, I just can't—my legs just starts aching then.

Q Well, I am asking you right now, as you sit here? Are you in any pain?

A Pain a little, yes, that's right.

Q You have a little pain?

A Yes, that's right.

Q Where is the pain?

A Right in my feet. Right around the ankles.

Q Around the ankles?

A Yes.

At the time of the hearing the plaintiff had not seen a doctor for the preceding six months. Even when viewed in light of plaintiff's explanation that he was both without funds and without faith in the medical profession's ability to aid him, this fact carries some significance. Finally, it is worthy of note that plaintiff not only stated that he had done no work since November 11, 1965, but also stated that he had not tried to get work at any time since that date.

This court finds no reason to reject the conclusion of Dr. Jenkins that plaintiff was capable of performing employment available in the national economy.

Plaintiff's counsel suggests, however, that neither position suggested by Dr. Jenkins is substantial gainful activity. This assertion is based upon the low scale of compensation offered to kitchen helpers and plastic packers and upon the fact that both jobs are considered to be for females. Counsel argues that plaintiff cannot be expected to accept a job paying $10 per day, after having left one paying twice that amount.

In the Code of Federal Regulations, Title 20 § 404.1532(b) (1969), the Social Security Administration defines substantial gainful activity as "work activity that is both substantial and gainful." "Substantial" involves "the performance of significant physical or mental duties, or a combination of both, productive in nature." "Gainful" requires "activity for remuneration * * * to the individual performing it * * *." The regulation continues:

It is immaterial that the work activity of an individual may be less, or less responsible, or less gainful, than that in which he was engaged before the onset of his impairment.

Reasonably applied this regulation is valid and enforcible. Employment as a kitchen helper or plastic packer is both substantial and gainful within the meaning of the regulation.

Therefore, since plaintiff has been unable to adequately refute the Government's evidence that he is capable of performing substantial gainful em-

ployment other than his usual occupation, the Secretary's (hearing examiner's) denial of benefits is supported by substantial evidence. His decision is affirmed.